MOORE, Judge.
In this workers’ compensation case, Patricia Phillips (“the dependent”) appeals from a summary judgment entered by the Blount Circuit Court in favor of Asplundh Tree Expert Company (“the employer”). In its judgment, the trial court determined that the dependent had failed to adduce clear and convincing evidence that the death of John Dan Phillips (“the employee”) arose out of and in the course of his employment. We affirm.

The Facts

The material facts pertinent to this appeal show that the employee ordinarily worked for the employer in north Alabama as a foreman. In August 2004, the employer assigned the employee and a co-employee, Lonny Bridges, to work in Florida cleaning up debris from a hurricane. At the time, the employee, who was 49 years old, was taking medication for high blood pressure, was taking a blood thinner, and wore support hose on his left leg due to thrombophlebitis.
The two men initially worked in Naples, Florida. They worked 14-hour days, 7 days per week, clearing brush in hot, muggy conditions. One man would gather the brush, which was not heavy, while the other man operated two levers in the air-conditioned cab of a loader truck to control a grapple that would pick up the brush and deposit it into the truck bed. The levers were no heavier than a soft drink. The loader-truck operator would get into position by climbing a 12-foot ladder to the cab. The two men swapped duties so that they would each climb into the cab about 60 times per day. They would take 10- or 15-minute breaks every couple of hours and a 30-minute lunch break during the day. They would sleep about eight hours per night in a hotel room provided by the employer.
After working for two weeks in Naples, the employee and Bridges traveled to Orlando, Florida. They reduced their work schedule to 12 hours per day, but they continued working every day with similar breaks and sleeping at night in a hotel room provided by the employer. While in Orlando, the employee complained that his leg was swelling, although it did not interfere with his work. Bridges called a supervisor and asked if he and the employee could both see a doctor. Bridges was concerned about his own high blood pressure. *1263 The supervisor offered to give the employee time off to see his doctor in Alabama or to find the employee a doctor in Florida. The employee did not see a medical doctor at the time, however. Instead, he soaked his leg in hot water each night.
On the Friday before Labor Day, Bridges, the employee, and several coworkers traveled back to Arab, Alabama, from Orlando. Bridges drove the entire 12-hour trip from Orlando while the passengers, including the employee, slept. They arrived in Arab between 1:00 a.m. and 4:00 a.m. on that Saturday morning.
The employee appeared exhausted and slept when he got home. The next day he stayed in his recliner most of the day after going to the grocery store with the dependent. The dependent noticed that the employee’s leg was swollen. The employee did not complain of any other problems, however. He did not visit a doctor while he was home that weekend, but he planned to go to the hospital on Labor Day to check his blood, which he did every four to six weeks.
On Sunday morning, the employee received a telephone call notifying him to return to Florida with Bridges the next day. The two men left their homes around 6:00 a.m. on Labor Day and arrived at them hotel in Orlando between 7:30 p.m. and 8:00 p.m. Bridges drove and the employee slept during some of the trip. The employee did not go to the hospital as he had planned.
The next two days, the men awoke around 5:00 a.m. and had breakfast in the hotel lobby. They then drove 30 minutes to their work site. They started working around 6:00 a.m. and worked until 7:00 p.m. They had a 30-minute lunch break. Bridges testified that because the employee’s leg was swollen, he tried to let the employee rest as much as possible. During that two-day period, the employee operated the loader truck while Bridges gathered the brush. The employee did not go up and down the ladder 60 times per day during this period. The employee had no complaints during this time period.
On Wednesday, September 8, 2004, after completing their workday around 7:00 p.m., the two men drove to a grocery store to get hot dogs to make for supper. The windows were down in the truck so that they had an opportunity to cool down. They arrived at their hotel around 8:00 p.m. The employee awaited a telephone call from the dependent, who called every night around 9:00 p.m. The employee talked to the dependent on the telephone for about 10 minutes, telling her he was tired. The employee then went into the bathroom to take a shower. Bridges started cooking the hot dogs while the employee took his shower. When the hot dogs were ready, Bridges called for the employee. When he got no response, he went into the bathroom and found the employee laying in the bathtub with no pulse. Bridges telephoned emergency 911 and paramedics arrived and commenced CPR at 9:16 p.m. Bridges traveled to the hospital where the employee was pronounced dead.
Dr. Marie Hansen, an associate medical examiner for Orange County, Florida, performed an autopsy the next day. Dr. Hansen concluded that the employee had died of a ruptured berry aneurysm due to hypertensive and atherosclerotic cardiovascular disease. Dr. Hansen opined in an affidavit that the employee had died a natural death. After reviewing the employee’s past medical records, the employee’s job description, and the events surrounding his death, Dr. Hansen stated that “I have no evidence to document that [the employ-eej’s job duties were a contributing cause of his aneurysm and resulting death.”
*1264 Dr. Bruce Romeo, a specialist in internal and occupational medicine, submitted an affidavit in which he opined that the employee had died from natural causes totally unrelated to his job duties. Specifically, Dr. Romeo stated that the employee died when a preexisting berry aneurysm aggravated by hypertensive and atherosclerotic cardiovascular disease ruptured. The doctor explained in his affidavit that the only contributing factor to the rupture was the hardening of the employee’s arteries from plaque formed by cholesterol and calcium that had built up over time and had eventually cut off the flow of blood. Dr. Romeo attributed the employee’s condition to a congenital defect placing him at a higher risk for a ruptured aneurysm than the normal population. Dr. Romeo opined that the employee’s job duties did not contribute to his aneurysm and resulting death.
Dr. Braxton Smith, a general practitioner, filed an affidavit for the dependent. Dr. Smith testified that he had treated the employee since 1997 for hypertension, left-leg thrombophlebitis, and deep-vein thrombosis. Dr. Smith was the physician who had prescribed the employee’s blood-thinner and high-blood-pressure medication. Dr. Smith opined that, as described to him, the working conditions during the three weeks preceding the employee’s death contributed to accelerate the rupture of the employee’s cerebral aneurysm that caused his death, due to elevated blood pressure on the aneurysm.
The parties subsequently deposed Dr. Smith. In his deposition, Dr. Smith described a berry aneurysm as a weakening of the vessel of the area of the brain, like a bubble. Medical science has not definitively determined the cause of a berry aneurysm, but the most probable cause is a gradual weakening of the vessel due to arteriosclerosis. Dr. Smith admitted that the employee’s job did not cause his berry aneurysm. As for the rupture of a berry aneurysm, Dr. Smith testified that many factors can lead to a rupture, including unknown stimuli, elevated blood pressure from ordinary physical stress such as walking down the street, smoking, and ar-teriosclerotic disease. Dr. Smith testified that he could not state with any reasonable degree of medical certainty what had caused the rupture of the employee’s aneurysm.
Dr. Smith admitted that at the time he signed the affidavit he misunderstood the details of the employee’s work duties in the weeks preceding his death. He did not know that the employee had taken the weekend off before his death. He also did not know that the employee had worked solely in the air-conditioned cab during the two days before his death and had not climbed the ladder leading to the cab 60 times on those days. He also did not know how much time had passed between the end of the workday and the employee’s death or that the employee had cooled down before arriving at the hotel that night.
Upon questioning by the dependent’s attorney, Dr. Smith testified that any activity the employee undertook or any exposure to hot temperatures “could have” contributed to his rupture by accelerating it and “possibly” increased his risk of rupture. However, on redirect examination, the doctor reiterated that he could not state with any reasonable degree of medical certainty that the employee’s job duties had anything to do with the ruptured aneurysm. He testified only that physical activity could, but not did, have an effect on the aneurysm. Dr. Smith agreed with an excerpt from a medical treatise indicating that even moderate physical activity can have an effect on an aneurysm. However, he conceded that he *1265 had no evidence to indicate that the employee’s blood pressure was elevated two hours after he quit working on the date of his death.

The Law Applicable to the Case

The dependent contends that the routine physical activities of the employee’s job over a three-week period elevated his blood pressure and contributed to the rupture of the employee’s preexisting berry aneurysm. In other words, the dependent claims that the employee suffered a nonac-cidental injury and death due to cumulative physical stress. See Ex parte Trinity Indus., Inc., 680 So.2d 262 (Ala.1996), and Ala.Code 1975, § 25-5-81(c). Accordingly, at trial, the dependent bore the burden of proving by clear and convincing evidence that the employee’s ordinary employment duties legally and medically caused the employee’s injury and resulting death. See Tee Jays Mfg. Co. v. Stults, 723 So.2d 684 (Ala.Civ.App.1998); Valtex, Inc. v. Brown, 897 So.2d 332 (Ala.Civ.App.2004).[1]
To establish legal causation, the dependent was required to show that “the performance of [the employee’s] duties as an employee exposed [the employee] to a danger or risk materially in excess of that to which people are normally exposed in their everyday lives.” Ex parte Trinity Indus., 680 So.2d at 267. To show medical causation, the dependent was required to prove that a risk to which the employee was exposed was, in fact, a contributing cause. Ex parte Trinity Indus., 680 So.2d at 269. “Clear and convincing evidence” is defined as
“evidence that, when weighted against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.”
Ala.Code 1975, § 25-5-81(c).

The Applicability of the Clear-and-Convincing-Evidence Standard to Summary-Judgment Proceedings

The dependent contends on appeal, however, that on a motion for a summary judgment she need only adduce substantial evidence of legal and medical causation in order to create a genuine issue of material fact that would warrant a trial. “Substantial evidence” is “ ‘evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ ” Ex parte Trinity Indus., 680 So.2d at 268 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989)). The dependent maintains that she presented substantial evidence of legal and medical causation through the testimony of Bridges and Dr. Smith. The dependent argues that the trial court erred in using the clear-and-con *1266 vincing-evidence standard at the summary-judgment stage.[2]
Following the entry of the summary judgment, the dependent filed a motion to alter, amend, or vacate the judgment. In that motion, the dependent conceded at several points that she bore the burden of proving legal and medical causation by clear and convincing evidence. She did not argue in that motion that the trial court had erred in applying the clear-and-convincing-evidence standard during the summary-judgment proceedings. This court cannot consider an issue raised for the first time on appeal. Buford v. Buford, 874 So.2d 562 (Ala.Civ.App.2003). “ ‘This court will not hold a trial court to be in error unless that court has been apprised of its alleged error and has been given the opportunity to act thereon.’ ” Tillis Trucking Co. v. Moses, 748 So.2d 874, 882 (Ala.1999) (quoting Sea Calm Shipping Co., S.A. v. Cooks, 565 So.2d 212, 216 (Ala.1990)). Because the dependent did not object in her post-judgment motion to the trial court’s use of the clear-and-convincing-evidence standard, the trial court was never given an opportunity to rule on the issue and we cannot now hold the trial court in error on this ground.
Even if we could consider this argument, we would find that the trial court did not err to the extent that it required the dependent to present clear and convincing evidence of legal and medical causation at the summary-judgment stage. While ordinarily to defeat a motion for a summary judgment the nonmovant must present substantial evidence that creates a genuine issue of material fact, see Ala. Code 1975, § 12-21-12(a), when the law imposes the higher burden of proof of elear and convincing evidence as to a particular claim or factual issue, the nonmov-ant must present evidence at the summary-judgment stage that would qualify as clear and convincing evidence if accepted and believed by the fact-finder. See Ala. Code 1975, § 12-21-12(e) (“With respect to any issue of fact for which a higher standard of proof is required, whether by statute, or by rule or decision of the courts of the state, substantial evidence shall not be sufficient to carry the burden of proof, and such higher standard of proof shall be required with respect to such issue of fact.”); Lowman v. Piedmont Exec. Shirt Mfg. Co., 547 So.2d 90 (Ala.1989); Gary v. Crouch, 923 So.2d 1130, 1141-42 (Ala.Civ.App.2005) (Murdock, J., concurring in the result); and KGS Steel, Inc. v. McInish, [Ms. 2040526, June 30, 2006] - So.3d -, - (Ala.Civ.App.2006) (Murdock, J., concurring in the result). See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the trial court properly analyzed the case using the clear-and-convincing-evidence standard.

Legal Causation

The dependent next argues that she presented sufficient evidence of legal causation. The legal-causation standard was developed
“to prevent employers from being unfairly saddled with the cost of being made the absolute insurer of an employee’s health. Without a ‘legal causation’ standard, a person who becomes ill or dies because of a natural cause, such as an aneurysm or slipping into a diabetic coma, unrelated to any job-related risk, would be able to recover under our workers’ compensation statute merely because he or she was lucky enough to *1267 have the disabling event resulting from that natural cause occur at the place of employment or just after the employee has left the place of employment. Such a result was not intended by the legislature when it enacted our workers’ compensation law.”
Ex parte Trinity Indus., 680 So.2d at 267 (emphasis added). Pursuant to the legal-causation test, a mere showing of a close spatial and temporal relationship between the injury and the performance of the duties of the job is not sufficient. 680 So.2d at 269. Rather, the test for legal causation is satisfied when the worker is exposed to a danger or risk of injury materially in excess of the baseline risk to which persons are exposed in their everyday lives. Id.
In this case, the employer presented evidence, consisting of the deposition testimony of Dr. Smith, indicating that on the date of his death, and the preceding two days, the employee was not exposed to a level of exertion in excess of that to which persons are exposed in their everyday lives. The employer further presented evidence indicating that the performance of the employee’s job duties did not increase the risk of a ruptured aneurysm from nonexertional causes such as smoking and arteriosclerosis. This evidence established a prima facie case that the performance of the employee’s job duties could not have legally caused the ruptured berry aneurysm. The burden then shifted to the dependent to present evidence that, when weighted against the employer’s evidence, could produce in the mind of the trier of fact a firm conviction that the employee’s job duties did, in fact, increase the risk of a ruptured berry aneurysm.
The dependent initially argues that she carried her burden of proof by showing that the employee exerted himself in high temperatures until the Friday before his Wednesday death. However, the dependent has failed to present clear and convincing evidence indicating that the employee’s job activities during that time period, even if they could be described as strenuous, increased the risk that the employee would rupture his aneurysm almost a week later. Dr. Smith opined that elevated blood pressure from physical stress increases the risk of a rupture, but, in his deposition, he stated that he could only be sure that physical stress on the date of the rupture could have had an effect.
The dependent next argues that the job of operating the loader on the date of his death exposed the employee to an increased risk of rupture. However, after reviewing the testimony of Bridges as to the duties the employee performed on the date of his death, Dr. Smith agreed that the employee had not been exposed to any physical stress beyond that which persons face in their ordinary lives. Dr. Smith further clarified that any activity, such as walking, could contribute to a ruptured aneurysm. Although it may be true that the employee performed some physical activity while working on the date of his death, the dependent has failed to present clear and convincing evidence indicating that this activity materially increased his risk of rupturing his aneurysm beyond the risk persons face in their everyday lives.
The dependent finally argues that the employee suffered from thrombophlebitis and that prolonged sitting on the drive to Orlando and in the loader truck placed additional stress on his leg that could have elevated his blood pressure and increased the risk of a ruptured aneurysm. However, although Dr. Smith testified that any pain or bad feeling could have affected the employee’s blood pressure, he did not indicate that the act of prolonged sitting increases the risk of a ruptured aneurysm, *1268 even for a person with thrombophlebitis, beyond the risk such a person would face in everyday life.
Based on our review of the entire record, we find that the dependent did not present clear and convincing evidence of legal causation. See Safeco Ins. Cos. v. Blackmon, 851 So.2d 532 (Ala.Civ.App.2002).

Medical Causation

The dependent asserts that the performance of the employee’s job duties did not cause his aneurysm but that the physical stress and heat exposure aggravated his thrombophlebitis, which in turn elevated his blood pressure to such a dangerous level that it caused his dormant aneurysm to burst. Under Alabama’s medical-causation standard, it is not necessary that the employment-related injury be the sole cause, or the dominant cause, of the death, so long as it was a contributing cause. See Ex parte Valdez, 636 So.2d 401 (Ala.1994). Job-related exertion can be a contributing cause if it is one of multiple factors acting in concert to bring about the occupational injury. Id. If occupational exertion aggravates a preexisting latent condition to cause death, the death will be compensable even though the physical stress would not have caused death to a normal person. See, e.g., TTC Servs. v. Pendergrass, 628 So.2d 693 (Ala.Civ.App.1993). If the employee suffers from a latent preexisting condition that inevitably will produce injury or death, but the employment acts on the preexisting condition to hasten the appearance of symptoms or to accelerate its injurious consequences, the employment will be considered the medical cause of the resulting injury. See, e.g., Taylor v. Mobile Pulley & Machine Works, Inc., 714 So.2d 300 (Ala.Civ.App.1997).
The employer submitted affidavits of two medical experts who unequivocally stated that the performance of the employee’s job duties did not, in fact, contribute to the rupture of the employee’s berry aneurysm. Rather, the rupture occurred due to the natural progression of hypertensive and atherosclerotic disease without any contribution from his employment. The burden, therefore, fell on the dependent to present clear and convincing evidence that the employee’s job duties did, in fact, accelerate the rupture of the aneurysm.
The dependent initially offered the affidavit of Dr. Smith in which he opined that the working conditions the employee had endured for the three-week period preceding his death, as Dr. Smith understood them, had contributed to accelerate the rupture of the employee’s berry aneurysm due to his elevated blood pressure. However, the parties subsequently deposed Dr. Smith. In his deposition, Dr. Smith testified that he could not state with any reasonable degree of medical certainty that the employee’s working conditions, when properly described to him, contributed to the employee’s ruptured aneurysm. Dr. Smith even conceded that he had no evidence to indicate that the employee was experiencing elevated blood pressure at the time of his death. For this reason, he would say only that any activity the employee engaged in on the date of his accident could have contributed to his aneurysm. Dr. Smith offered no testimony indicating that the employee’s job activities more probably than not accelerated the rupture of the aneurysm,[3] much less testi *1269 mony indicating that the employee’s job activities did, in fact, contribute to the rupture.
Viewing the totality of Dr. Smith’s testimony, see Ex parte Southern Energy Homes, Inc., 873 So.2d 1116 (Ala.2003), we find that the dependent offered nothing more than evidence of mere possibilities that would only serve to “guess” the employer into liability. See Hammons v. Roses Stores, Inc., 547 So.2d 883, 885 (Ala.Civ.App.1989). The dependent has not presented evidence showing a definite causal connection between the accident and the injury. See Goodyear Tire & Rubber Co. v. Correll, 736 So.2d 624 (Ala.Civ.App.1999).
In KGS Steel, Inc. v. McInish, [Ms. 2040526, June 30, 2006] - So.3d - (Ala.Civ.App.2006), this court reversed a permanent-total-disability award based on a trial court’s finding that the worker had sustained neck and shoulder injuries from repetitive bouncing and jerking while driving a truck for his employer. The court noted that the clear-and-convincing-evidence standard applied and held that the testimony of two experts “amount[ed] to nothing more than a showing of ‘possible’ causation that is insufficient to support the trial court’s judgment .... ” — So.3d at -. One expert testified that the worker’s condition could have been caused by cumulative trauma, but he admitted that he had no evidence to dispute the testimony of two other doctors who had opined that the worker’s condition was not work-related. That expert refused to testify that the work definitely contributed to the condition to a reasonable degree of medical certainty. Another physician stated that the injury “certainly could be work-related,” but he later deferred to the primary treating physicians because he had not treated the worker for some time after the alleged injury. See also United Defense, L.P. v. Willingham, 829 So.2d 771 (Ala.Civ.App.2002); and Oden v. Gulf States Steel, Inc., 797 So.2d 1093 (Ala.Civ.App.2001).
As in McInish, we find that the testimony of Dr. Smith does not constitute evidence from which a reasonable fact-finder could be clearly convinced that the employee’s job activities did, in fact, contribute to his death. Accordingly, we affirm the summary judgment.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, J., concur.
BRYAN, J., concurs in the result, with writing.
THOMAS, J., concurs in the result, without writing.

. In its judgment, the trial court cited Ex parte Trinity Indus., supra, for the proposition that nonaccidental injuries must be proven by clear and convincing evidence. The dependent correctly points out that Trinity did not employ the clear-and-convincing-evidence standard. However, the supreme court later clarified that the Trinity court reviewed the case under the substantial-evidence standard solely because neither party raised the issue of the applicability of the clear-and-convincing-evidence standard. The supreme court has since held that the clear-and-convincing-evidence standard applies to nonaccidental injuries allegedly caused by gradual deterioration or cumulative physical stress. See Ex parte Russell Corp., 725 So.2d 264 (Ala.1998).

. In its summary-judgment order, the trial court actually referenced both the clear-and-convincing-evidence standard and the substantial-evidence standard.

. In her brief, the dependent argues that Dr. Smith did indicate on pages 52-53 of his deposition that it was more probable than not thal the employee's job duties contributed to the rupture. However, we have thoroughly reviewed the cited excerpt. The doctor mere *1269 ly testified that any kind of activities, whether work-related or not, could have been a factor in a ruptured aneurysm in a person with the preexisting medical problems like the employee had and that the employee would have been more affected by physical activity due to his preexisting medical condition. Dr. Smith did not testify that it was more probable than not that the employee's working conditions contributed to his ruptured aneurysm.