Rel: October 4, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## SPECIAL TERM, 2024

––––––––––––––––––––––––

### SC-2023-0601

––––––––––––––––––––––––

## Ex parte Jackson Hospital & Clinic, Inc.

## PETITION FOR WRIT OF MANDAMUS

## (In re: Theresa Johnson, individually and as executor of the Estate of Nathaniel Johnson, deceased

## v.

## Jackson Hospital & Clinic, Inc.)

## (Montgomery Circuit Court: CV-21-900980)

SHAW, Justice.[1]

Jackson Hospital & Clinic, Inc. ("Jackson Hospital"), has filed a petition for a writ of mandamus, requesting that this Court direct the Montgomery Circuit Court to enter a summary judgment in its favor in the wrongful-death action commenced against it by Theresa Johnson ("Johnson"), individually and in her capacity as the executor of the estate of her deceased husband, Nathaniel Johnson. For the reasons stated below, we grant the petition.

Background

On March 13, 2020, Governor Kay Ivey issued a proclamation ("the March 13 proclamation") stating that the State Health Officer had reported "the appearance of the 2019 novel coronavirus known as COVID-19 in the State of Alabama" and that the appearance of COVID-19 indicated "the potential of widespread exposure to an infectious agent that poses significant risk of substantial harm to a large number of people." Therefore, under the Alabama Emergency Management Act of 1955 ("the AEMA"), § 31-9-1 et seq., Ala. Code 1975, Governor Ivey

---

[1]This case was originally assigned to another Justice on this Court; it was reassigned to Justice Shaw.

declared "that a state public health emergency" existed in Alabama. Governor Ivey further found "that COVID-19 cases could overwhelm the health care facilities and personnel of this State and undermine their ability to deliver patient care in the traditional, normal, and customary manner or using the traditional, normal, and customary standards of care."

On May 8, 2020, Governor Ivey issued a supplemental proclamation ("the May 8 proclamation").[2] The May 8 proclamation recognized that "the health threat posed by COVID-19 is severe and potentially lethal to many citizens of Alabama," that it was "necessary to promote and secure the safety and protection of the civilian population by ensuring that Alabama's health care providers have adequate protections and our health care system has adequate capacity to provide health care," and that "many aspects of this public health emergency remain uncertain and new impacts and repercussions of COVID-19 are continually coming to light." Thus, under the AEMA, Governor Ivey proclaimed "the existence of conditions that warrant implementation of additional extraordinary

---

[2]The materials before us indicate that the May 8 proclamation was the eighth supplement to the March 13 proclamation.

measures and relief during the state health emergency now in effect in order to guard public health and protect human life."  The May 8 proclamation provided further "findings," including the following:

> "… That COVID-19 cases have put, and will continue to put, a significant strain on the health care facilities, health care providers, and health care resources of this State and that COVID-19 cases have undermined, and will continue to undermine, the ability to deliver patient care or obtain certain equipment or materials in the traditional, normal, or customary manner;

> "… That COVID-19 has affected, and will continue to affect, our health care system in unique and potentially devastating ways, and our health care facilities, health care professionals, and their supporting workers need protection to respond to this pandemic and to do what they can do to continue to provide treatment and services for the people of Alabama;

> "….

> "… That reasonable protections from the risk and expense of lawsuits … will encourage businesses to re-open and repair the damage to the economy of the State and the tax revenues of the State and of local governments; and

> "… That providing such a safe harbor to businesses and healthcare providers that operate reasonably consistent with applicable public health guidance will help ameliorate the social harms of a closed economy and the spread of COVID-19."

The May 8 proclamation, as discussed in more detail below, further provided certain legal-liability protections for health-care providers.

Subsequently, the legislature passed the Alabama Covid Immunity Act ("the ACIA"), Act No. 21-4, Ala. Acts 2021, codified at § 6-5-790 et seq., Ala. Code 1975. In § 6-5-790(2), Ala. Code 1975, the legislature found and declared the following:

> "[COVID-19] has put, and will continue to put, a significant strain on health care facilities, health care providers, and health care resources of this state; [COVID-19] has undermined, and will continue to undermine, the ability to deliver patient care in the traditional, normal, or customary manner; and our health care facilities, health care professionals, and their supporting workers need protection to respond to this pandemic and to do what they can do to continue to provide treatment and services for the people of Alabama."

The ACIA, as discussed in more detail below, thus provides to health-care providers certain protections from liability when treating COVID-19 patients. The ACIA became effective February 12, 2021,[3] and

---

[3]According to a proclamation issued by Governor Ivey on December 11, 2020, "the COVID-19 pandemic severely curtailed the Legislature's 2020 regular session, causing the Legislature to miss nine -- or thirty percent -- of the thirty legislative days available for the consideration of legislation." Further, that proclamation stated that the "COVID-19 guidelines" issued by the United States Centers for Disease Control and Prevention and the Alabama Department of Public Health indicated that

states that it applies retroactively to causes of action filed on or after March 13, 2020. Ala. Acts 2021, Act No. 21-4, § 11. Further, § 6-5-799, Ala. Code 1975, indicates that the ACIA "shall terminate December 31, 2021, or one year after a declared health emergency relating to [COVID-19] expires, whichever is later." Finally, § 6-5-796, Ala. Code 1975, states that the ACIA "shall be construed in pari materia with the [AEMA] and with any emergency order or proclamation of the Governor relating to [COVID-19] and immunity from civil lawsuits."

### Facts and Procedural History

After the May 8 proclamation was issued, but before the effective date of the ACIA, Nathaniel Johnson, who was suffering from COVID-19, was admitted to Jackson Hospital's facility on November 26, 2020. He was placed in a room on the sixth floor, which was a floor for COVID-19 patients. At that time, Nathaniel was prescribed the use of a device called a BiPAP, which provided pressurized air and oxygen to assist with

---

"it may not be safe or prudent at this time to call the Legislature into special session." In her amicus brief filed in this Court, Governor Ivey asserts that the proclamations she issued served as a "stopgap measure" and that the need for an "emergency provision of liability protections" ended when the legislature passed the ACIA. Governor Ivey's amicus brief at 9-10.

breathing. The BiPAP device could be set to deliver certain levels of air pressure and oxygen. Oxygen was provided to the BiPAP device from one of two oxygen-supply outlets on the room's wall.

On December 6, 2020, a doctor ordered that Nathaniel be moved to the third floor, where a special unit allowing patients to be more closely monitored was located. To prevent the spread of COVID-19 to other patients and staff, certain procedures were in place concerning how COVID-19 patients were transferred between rooms. Specifically, patients with COVID-19 could not be transferred while using a BiPAP device because such devices lacked an "expiratory filter," meaning that they expelled unfiltered air breathed out by the patient. Instead, patients were transported using oxygen masks, which are also referred to in the materials before us as "OxyMasks," that were covered with a surgical mask. The facts before us indicate that a respiratory therapist would disengage the BiPAP device and place on the patient the oxygen mask, which used the second oxygen outlet that had a "flowmeter" to regulate the amount of oxygen provided. The respiratory therapist would set the correct oxygen level on the flowmeter. Jackson Hospital asserts that, after the oxygen mask was placed, the respiratory therapist would

7

take the BiPAP device and any other equipment to the patient's new room so that it would be immediately ready when the patient arrived. When the patient was to be moved, the patient's nurse would change the oxygen mask's oxygen supply to a portable oxygen bottle.

Stephanie Sharpe, a respiratory therapist who had treated Nathaniel, testified in a deposition that she had been tasked with preparing him for transportation to the third floor. Sharpe stated that, on her way to Nathaniel's sixth-floor room, she had asked another respiratory therapist, Taylor King, to assist her. According to Sharpe, while in Nathaniel's room, she had removed his BiPAP device and had placed an oxygen mask on him. Sharpe indicated that she had set the oxygen-supply outlet's flowmeter to "15 liters," referring to the amount of oxygen provided. She further testified that she then had monitored Nathaniel for a few minutes. Johnson, Nathaniel's wife, was present in the room at the time.

Sharpe and Taylor then took the BiPAP device and other equipment from the room, and the nurse outside the room said that she would get a portable oxygen tank. Sharpe denied that a respiratory therapist was

required to stay with a patient while a BiPAP device was being set up in a patient's new room.

King, the other respiratory therapist present, also testified that Sharpe, after removing the BiPAP device from Nathaniel, had "hooked him up to a 15-liter OxyMask." King indicated that she could hear the oxygen flow in the mask, stating: "[W]hen you turn it on, 15 liters on the OxyMask, you can hear it." However, Johnson testified that Sharpe had not placed an oxygen mask on Nathaniel after she had removed the BiPAP device.

Both Sharpe and King testified that Nathaniel had experienced no problems during this process. They took the BiPAP device and other equipment to Nathaniel's new room on the third floor and set it up. There, they heard a "code" announced calling an "ICE team" to Nathaniel's room, meaning that nurses and respiratory therapists were to respond because he was in distress. When Sharpe and King arrived at the room, a team was attempting to revive Nathaniel, but he passed away.

On September 9, 2021, Johnson, in her capacity as the executor of Nathaniel's estate, commenced a wrongful-death action against Jackson

Hospital. The complaint alleged that Jackson Hospital had breached the standard of care required for a medical facility, that it had negligently or wantonly caused Nathaniel's death, and that it had been negligent or wanton in the hiring, supervision, and training of its employees. Johnson also alleged a claim of loss of consortium. Stated generally, the complaint alleged that Nathaniel had required supplemental oxygen but that, during the process of moving him to another room, his supplemental-oxygen supply had been removed, causing his death.

Jackson Hospital filed an answer to the complaint. Among other things, Jackson Hospital contended that it was immune from liability. After some discovery was conducted, it moved for a summary judgment. The motion was supported by the affidavits of Sharpe, King, and Eric S. Cunningham, a hospitalist employed by Jackson Hospital who was apparently the chief of medicine at the time of Nathaniel's treatment and death.

Jackson Hospital argued that it was entitled to immunity under Ala. Code 1975, §§ 6-5-792 and -794, of the ACIA, under the May 8 proclamation, and under the AEMA. Jackson Hospital further argued that its evidence demonstrated that its staff had immediately placed an

oxygen mask on Nathaniel to provide supplemental oxygen after the BiPAP device had been removed and that, at no point during the attempt to transfer him to another room, had he been denied supplemental oxygen.

The procedural history that followed is complex and, for purposes of this opinion, need not be discussed in detail. Instead, it is sufficient to note that Johnson filed a motion pursuant to Rule 56(f), Ala. R. Civ. P., to seek additional discovery before responding to Jackson Hospital's motion for a summary judgment. Subsequently, the trial court held a hearing on that motion. Jackson Hospital argued that it was immune under the ACIA and pursuant to the powers granted to the governor under the AEMA. Johnson argued, however, that there was an exception for wanton conduct, that Jackson Hospital had not followed its alternative standard of care, and that she was entitled to more discovery to oppose Jackson Hospital's motion. After the hearing, the trial court entered a summary judgment in favor of Jackson Hospital.

Johnson filed a motion under Rule 59(e), Ala. R. Civ. P., to alter, amend, or vacate that judgment. The motion was supported by Johnson's affidavit. In that affidavit, Johnson indicated that, at the time of

11

Nathaniel's death, she had been employed as a "patient care technician" for Jackson Hospital and had been in the room when Nathaniel's BiPAP device was removed. According to her, no respiratory therapist had placed an oxygen mask on Nathaniel after the BiPAP device was removed. After the respiratory therapists had left the room, Johnson stated, Nathaniel had struggled and had been unable to catch his breath.

Johnson argued in her Rule 59(e) motion that there was a factual dispute as to whether Jackson Hospital's conduct was wanton, that claims of wanton conduct were exempted from the ACIA under § 6-5-793, Ala. Code 1975, and that that Code section further provided an exception to immunity if Jackson Hospital did not reasonably attempt to comply with the then applicable public-health guidance. According to Johnson's affidavit, in December 2020, Jackson Hospital's policy, as well as the then applicable public-health guidance, was:

> "for respiratory therapists to accompany BiPap patients while they are off the BiPap machine and be standing by with, at a minimum, a 'crash cart' and AMBU Self Inflating Resuscitator so that in the event of an oxygen insufficiency a patient could be manually resuscitated. The patient was also supposed to be evaluated beforehand to determine if they could withstand the time off the BiPap machine."

Johnson concluded her affidavit by stating that, to her knowledge, "none of these guidelines were complied with in my husband's case." Finally, the Rule 59(e) motion requested that Johnson be able to depose Jackson Hospital's witnesses, as requested in her previously filed Rule 56(f) motion.

The trial court ultimately set aside its summary judgment to allow Johnson to take the depositions of Sharpe, King, and Cunningham. Those depositions subsequently took place.

In further filings by the parties, argument continued as to whether Jackson Hospital's motion for a summary judgment should be granted. Johnson argued that Jackson Hospital had no immunity under the May 8 proclamation. Specifically, she argued that the AEMA did not provide authority to the governor to alter substantive tort law or to provide immunity from tort actions. Further, she said, any attempt by Governor Ivey to do so violated Ala. Const. 2022, Art. I, § 21, which, she argued, allowed only the legislature to suspend law, and further violated the separation-of-powers doctrine provided by Ala. Const. 2022, Art. III, §

42.[4] Further, Johnson claimed that because the ACIA had been enacted after her cause of action had vested, its application to her action was barred by Ala. Const. 2022, Art. I, § 13, which, she argued, prohibited the retroactive abrogation of a vested cause of action. Finally, she argued that she had presented sufficient evidence, through her affidavit and the depositions of Sharpe, King, and Cunningham, demonstrating wanton conduct and the failure of Jackson Hospital to follow public-health guidance, which conduct and failure, she claimed, excepted Jackson Hospital from immunity under § 6-5-793 of the ACIA.

Jackson Hospital, on the other hand, argued that, because it had been provided immunity by the May 8 proclamation, which had been issued before Nathaniel's treatment and death, Johnson did not have a "vested right of action" against it for purposes of § 13. Further, it contended, the issuance of the May 8 proclamation had been within the powers provided to the governor by the AEMA and that proclamation had

---

[4]The Alabama Constitution of 2022 was ratified in 2022 and succeeds the Alabama Constitution of 1901. Although, in the materials before us, both constitutions are cited, we cite the Alabama Constitution of 2022. As to the content of the provisions discussed, there is no material difference between the two constitutions, except that § 43 of the 1901 constitution is now found in § 42(c) of the 2022 constitution.

not violated Alabama's constitution and had subsequently been endorsed by the legislature in the ACIA. It also argued that the evidence before the trial court established that the actions of Jackson Hospital's employees had not been wanton.

Governor Ivey filed an amicus brief in the trial court in support of Jackson Hospital's motion for a summary judgment, providing argument and authority to demonstrate that the May 8 proclamation complied with the AEMA and was constitutional. The Business Council of Alabama, the Alabama Civil Justice Reform Committee, and the Alabama Hospital Association also provided a joint amicus brief arguing that the application of the ACIA in this case would not be unconstitutional.

Ultimately, the trial court issued an order denying Jackson Hospital's motion for a summary judgment. The trial court's rationale was narrow. As discussed further below, it held that Johnson's action could proceed under § 6-5-793, which it described as providing an "exception" to the immunity provided by the ACIA. Although it acknowledged that Johnson had challenged the constitutionality of the ACIA and had cited exceptions to it, the trial court declined to rule on "the constitutional issues or wantonness exception."

15

Jackson Hospital filed a motion to vacate or to clarify the trial court's order denying its motion for a summary judgment, which was supported by, among other things, an affidavit of Regan Sullivan, a respiratory therapist who was Jackson Hospital's Director of Respiratory Care and was Sharpe and King's supervisor. According to Sullivan, there had been no policy in place at the time of Nathaniel's death that required a respiratory therapist to be physically present when a patient was being transported from one room to another. She stated that there was no medical necessity for a respiratory therapist's presence in those circumstances because nurses were trained to respond to any medical emergency that could occur. She indicated that, instead, when a patient was transported, the role of a respiratory therapist was merely to retrieve equipment from the patient's room and transport it to the new room. This, she said, allowed the patient to be immediately placed on the equipment in the new room.[5]

Jackson Hospital then filed with this Court a petition for a writ of mandamus, requesting that this Court direct the trial court to enter a

---

[5]The materials before us do not reveal whether the trial court ruled on Jackson Hospital's motion to vacate or to clarify the order denying its summary-judgment motion.

summary judgment in its favor in Johnson's action. This Court ordered an answer and briefs. After oral argument, the case was submitted to the Court.

## Standard of Review

"While the general rule is that denial of a summary-judgment motion is not immediately reviewable by an appellate court, the exception to the general rule is that a denial of a motion for a summary judgment grounded on a claim of immunity is immediately reviewable by a petition for a writ of mandamus ...."

Ex parte Wood, 852 So. 2d 705, 708 (Ala. 2002). A writ of mandamus is "appropriate when the petitioner can show (1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court." Ex parte BOC Grp., Inc., 823 So. 2d 1270, 1272 (Ala. 2001).

## Discussion

### A.

In its mandamus petition, Jackson Hospital addresses the issue presented by the trial court's narrow ruling: whether § 6-5-793 allows Johnson's action to proceed despite the immunity provided by other provisions of the ACIA.

17

Stated generally, the ACIA provides, in pertinent part, broad immunity to health-care providers from negligence actions stemming from medical care provided in relation to the COVID-19 pandemic. Section 6-5-792 provides, in part:

> "(a) Notwithstanding any other provision of law, a covered entity shall not be liable for any damages, injury, or death suffered by any person or entity as a result of, or in connection with, a health emergency claim that results from any act or omission of the covered entity.
>
> "(b) Subsection (a) does not apply if the claimant proves by clear and convincing evidence that the covered entity caused the damages, injury, or death by acting with wanton, reckless, willful, or intentional misconduct."

A "covered entity" is defined as, among other things, a "health care provider." § 6-5-791(a)(5), Ala. Code 1975. A "health emergency claim" is defined, in part, as "[a]ny claim that arises from or is related to Coronavirus." § 6-5-791(a)(13). See also § 6-5-791(a)(4) (identifying "Coronavirus" as "Coronavirus disease 2019, commonly abbreviated as 'COVID-19'"). Thus, under § 6-5-792, a health-care provider is not liable for any damages, injury, or death suffered "as a result of, or in connection with," a "claim that arises from or is related to" COVID-19, unless subsection (b) applies, which allows liability when the claimant can show

18

by clear and convincing evidence that a health-care provider acted "with wanton, reckless, willful, or intentional misconduct."[6] In other words, for purposes of this case, a health-care provider is immune in a negligence action related to the treatment of a COVID-19 patient.

Section 6-5-794(a) also provides a potentially overlapping form of immunity. It states, in pertinent part:

> "Absent wanton, reckless, willful, or intentional misconduct, a health care provider is not liable for any damages, injury, or death alleged to have been caused by an act or omission of the health care provider during the performance or provision of health care services or treatment that resulted from, was negatively affected by, was negatively impacted by a lack of resources caused by, or was done in response to the Coronavirus pandemic or the state's response to the pandemic."

(Emphasis added.) As pertinent to this case, that Code section provides immunity from negligence actions related to a health-care provider's acts or omissions in the provision of care or treatment that resulted from, or was in response to, COVID-19.

---

[6]Subsections 6-5-792(c)-(d) further provide limitations on the damages recoverable in an action allowed by subsection (b) or in a wrongful-death action.

In this case, there is no dispute that Jackson Hospital is a health-care provider and that its medical treatment and care of Nathaniel was related to COVID-19. Under the plain language of §§ 6-5-792 and -794, Jackson Hospital would be immune from Johnson's negligence claims.

B.

The trial court, in its order denying Jackson Hospital's summary-judgment motion, did not address whether Jackson Hospital was immune under §§ 6-5-792 and -794. Instead, as noted above, it held that Johnson's action could proceed under § 6-5-793. That Code section states, in pertinent part:

> "(a) This section applies to both of the following causes of action that accrue before the effective date of [the ACIA]:
>
>> "(1) A health emergency claim [that is, any claim that arises from or is related to COVID-19,] for which a court holds that neither Section 6-5-792 nor the liability limiting provisions of any gubernatorial emergency order applies.
>
>> "(2) Any cause of action relating to an act or omission of the health care provider during the performance or provision of health care services or treatment that resulted from, was negatively affected by, was negatively impacted by a lack of resources caused by, or was done in response to the

Coronavirus pandemic or the state's response to the pandemic, for which a court holds that neither Section 6-5-794 nor the liability limiting provisions of any gubernatorial emergency order applies.

"(b) For any health emergency claim or cause of action under subsection (a), the following provisions shall apply:

"(1) Notwithstanding any other provision of law, as a matter of law, a covered entity shall not be liable for negligence, premises liability, or for any non-wanton, non-willful, or non-intentional civil cause of action to which this section applies, unless the claimant shows by clear and convincing evidence that the covered entity did not reasonably attempt to comply with the then applicable public health guidance.[7]"

The trial court held that Johnson's action could proceed according to the terms of subsection (b)(1). Specifically, it found that Jackson Hospital's employees were following an "alternate standard of care" in transporting Nathaniel. According to the trial court, Cunningham testified in his deposition that, under this alternate standard of care, when BiPAP devices were removed, respiratory therapists would accompany patients along with the nurse to transport them if they were

---

[7]Subsections 6-5-793(b)(2)-(3) further provide limitations on the damages available for an action permitted under that Code section.

moving from one floor to another. However, the evidence indicated that both respiratory therapists had left Nathaniel for the nurse alone to move him and had not been present to accompany him during the transportation. Emphasizing § 6-5-793(b)(1), the trial court held that King and Sharpe "did not follow either the then applicable public health guidance or Jackson Hospital's alternate standard of care." The trial court thus held that Johnson had "proven an exception to ACIA immunity by showing that Jackson Hospital's respiratory therapists did not reasonably attempt to comply with then applicable public health guidance or Jackson Hospital's alternative standard of care."

As Jackson Hospital notes in its petition, under § 6-5-793(a)(1)-(2), § 6-5-793 applies to actions when a court "holds" that neither § 6-5-792, nor § 6-5-794, nor any gubernatorial emergency order applies. Only then does § 6-5-793(b)(1) provide that the action may proceed if "the claimant shows by clear and convincing evidence that the covered entity did not reasonably attempt to comply with the then applicable public health guidance." Section 6-5-793(b) is not an exception to the other provisions of the ACIA; instead, it covers actions when § 6-5-792, § 6-5-794, and a gubernatorial emergency order do not apply.

22

As demonstrated above, the plain language of §§ 6-5-792 and -794, and, as discussed below, the May 8 proclamation, would apply to Johnson's action; thus, § 6-5-793, by its own terms, would not apply. Given the arguments made to the trial court, the only way that it could have determined that §§ 6-5-792 and -794 (and the May 8 proclamation) did not control would be if those were, as Johnson argued, unconstitutional as applied in her case or if the exceptions for wantonness claims applied. However, the trial court explicitly held that it did not "rule on the constitutional issues." Further, the trial court refused to address whether Johnson's action could proceed under a "wantonness exception." Jackson Hospital's petition thus demonstrates that the trial court's rationale for denying the motion for a summary judgment under the authority of § 6-5-793 was erroneous.

## C.

In her answer to Jackson Hospital's petition, Johnson argues, as an alternate basis to deny the petition, that, under Alabama's Constitution, the ACIA cannot bar her action. As noted above, the trial court refused to address this issue, and Johnson's constitutional challenge to the ACIA did not form a basis for its decision. However, this Court may deny a

mandamus petition for any valid legal ground, even if that ground was not considered by the trial court. See Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So. 2d 1013, 1020 (Ala. 2003) ("[T]his Court will affirm the trial court on any valid legal ground presented by the record, regardless of whether that ground was considered, or even if it was rejected, by the trial court."), and Ex parte Moulton, 116 So. 3d 1119, 1133-34 (Ala. 2013) (applying the principle stated in Liberty National in the context of a mandamus petition).

Johnson argues that the retroactive application of the ACIA to her claims violates § 13 of the Alabama Constitution, which, she argues, "prevents the legislature from removing [a] remedy after accrual of a cause of action." Answer at 15. Section 13 provides: "That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay." This Court has explained the operation of § 13 as follows: "[T]he right to the remedy must remain and cannot be curtailed after the injury has occurred and right of action vested, regardless of the source of the duty which was breached, provided it remained in existence when the

24

breach occurred." Pickett v. Matthews, 238 Ala. 542, 545, 192 So. 261, 264 (1939). See also Kruszewski v. Liberty Mut. Ins. Co., 653 So. 2d 935, 937 (Ala. 1995) ("[Section] 13 of the Alabama Constitution applies only in instances where a litigant has a vested interest in a particular cause of action. Existing duties are not preserved against legislative change made before a breach of duty occurs.").[8] In response to Johnson's argument, Jackson Hospital contends, as it did in the trial court, that Johnson had no right to a cause of action when the ACIA became effective after Nathaniel's death because Jackson Hospital had already been immunized from such action under the May 8 proclamation, which was issued before Nathaniel died and before any action against it based on his death would have accrued and vested.

The May 8 proclamation was issued by Governor Ivey under powers provided by the AEMA. Under Ala. Code 1975, § 31-9-8(a), of the AEMA, the governor may proclaim a "state of emergency" related to a "public

_____

[8]This Court, in analyzing whether one has been deprived of a remedy in violation § 13, has utilized two approaches, the "vested rights approach" exemplified in Pickett and discussed in Kruszewski, supra, and the later-developed "common-law rights approach." See generally Reed v. Brunson, 527 So. 2d 102 (Ala. 1988) (discussing the history of both approaches). The parties in this case utilize the "vested rights approach," and we so limit our own analysis.

health emergency."  See Ala. Code 1975, § 31-9-3(4) (defining a "state of emergency" as, among other things, "the existence of conditions of disaster or of extreme peril to the safety of persons and property within the state caused by ... epidemic ...."), and § 31-9-3(5) (defining a "state public health emergency," in part, as "an occurrence or imminent threat of an illness or health condition").  Such a state of emergency terminates within 60 days unless it is extended by further proclamation.  § 31-9-8(a).  During that period, the governor has the power to enforce "all laws, rules, and regulations relating to emergency management."  § 31-9-8(a)(1).  Further, the governor has the "additional" emergency power "[t]o perform and exercise such other functions, powers and duties <u>as are necessary</u> to promote and secure the safety and protection of the civilian population."  § 31-9-8(a)(5) (emphasis added).  In performing duties under the AEMA, the governor is also authorized and empowered to "make, amend, and rescind the <u>necessary</u> orders, rules, and regulations to carry out the provisions of [the AEMA] within the limits of the authority conferred upon him or her" by the AEMA.  § 31-9-6(1), Ala. Code 1975 (emphasis added).  "All orders, rules, and regulations promulgated by the Governor … shall have the full force and effect of law," and "[a]ll existing <u>laws,</u>

ordinances, rules, and regulations or parts thereof inconsistent with the provisions of [the AEMA] or of any order, rule, or regulation issued under the authority of [the AEMA]" are "suspended during the period of time and to the extent that such inconsistency exists." § 31-9-13, Ala. Code 1975 (emphasis added).

Jackson Hospital contends that the May 8 proclamation "is exactly the kind of emergency order authorized" by the AEMA and that Governor Ivey acted "to reduce the risk of a flood of pandemic-related litigation aimed at healthcare providers … operating under extraordinary conditions." Jackson Hospital's reply brief at 9. Under the title "liability protections," that proclamation states:

> "A business, health care provider, or other covered entity shall not be liable for the death or injury to persons or for damage to property in any way arising from any act or omission related to, or in connection with, COVID-19 transmission or a covered COVID-19 response activity, unless a claimant shows by clear and convincing evidence that the claimant's alleged death, injury, or damage was caused by the business, health care provider, or other covered entity's wanton, reckless, willful, or intentional misconduct."

A "COVID-19 response activity" is defined by the May 8 proclamation as, among other things: "Any performance or provision of health care services or treatment by a health care provider that resulted from, was

27

negatively affected by, was negatively impacted by a lack of resources caused by, or was done in response to the COVID-19 pandemic or the State's response thereto."  The May 8 proclamation further describes itself as providing "immunity."

As with the discussion of §§ 6-5-792 and -794 above, there is no dispute that Jackson Hospital is a health-care provider and that its treatment of Nathaniel was related to COVID-19.  Thus, under the May 8 proclamation, Jackson Hospital would not be liable for negligent conduct that allegedly caused Nathaniel's death.

However, Johnson challenges whether the May 8 proclamation exceeded the powers conferred to the governor by the AEMA and further violates the Alabama Constitution.  Johnson first argues that none of the specific powers conferred by § 31-9-6 and § 31-9-8 authorize the governor to change substantive tort law.  We disagree.  As noted above, the AEMA allows the governor, during a state of emergency, "[to] perform and exercise such other functions, powers and duties as are necessary to promote and secure the safety and protection of the civilian population."

28

§ 31-9-8(a)(5).[9]  In performing duties under the AEMA, "the Governor is authorized and empowered ... [t]o make … the necessary orders, rules, and regulations to carry out " the AEMA.  § 31-9-6(1).  Moreover, § 31-9-13 makes clear that the "orders, rules, and regulations" issued by the governor suspend "[a]ll existing laws" that are in conflict.  The AEMA contains no limitation proscribing the governor from providing immunity to certain tort actions.

Johnson also contends that, in altering tort law and providing health-care providers with immunity, Governor Ivey violated the separation-of-powers doctrine provided in Ala. Const. 2022, Art. III, § 42(c), which provides:

> "To the end that the government of the State of Alabama may be a government of laws and not of individuals, and except as expressly directed or permitted in this constitution, the legislative branch may not exercise the executive or judicial power, the executive branch may not exercise the legislative or judicial power, and the judicial branch may not exercise the legislative or executive power."

Johnson also argues that Governor Ivey violated Ala. Const. 2022, Art. I, § 21, which states: "That no power of suspending laws shall be exercised

---

[9]The language of § 31-9-8(a)(5) is specifically referenced in the May 8 proclamation.

29

except by the legislature." In support of these arguments, she cites Hawkins v. James, 411 So. 2d 115, 119 (Ala. 1982), and Opinion of the Justices No. 238, 345 So. 2d 1354, 1355 (Ala. 1977).

In Hawkins, a state employee challenged an executive memorandum issued by the governor directing State department heads to not recommend a waiver for employees who wanted to work past the then compulsory retirement age of 70. 411 So. 2d at 117. This, it was alleged, was inconsistent with a then-existing statute. Id. Finding that the governor's memorandum had "the effect of altering the process" provided in the statute, this Court held that it had "the effect of an exercise of legislative power," which violated what is now § 42(c) of the Alabama Constitution. 411 So. 2d at 119.

In Opinion of the Justices No. 238, the governor requested an advisory opinion as to whether a proposed bill was constitutional. 345 So. 2d at 1355. That bill would have allowed the governor to freeze or roll back utility rates set by the Public Service Commission "'when in his considered opinion extraordinary action in the matter of utility rates is called for ….'" Id. Noting that the power to fix utility rates "lies with the legislature … or … in its duly constituted agency, such as the Public

Service Commission," and that the governor "cannot be an agency of the Legislature under the separation of powers provisions of our Constitution," the Justices concluded, among other things, that the proposed bill would violate the separation-of-powers doctrine. 345 So. 2d at 1156.

The Justices further indicated that the proposed bill violated § 21. Specifically, the Justices determined that, because the legislature had provided by statute that the utility rates established by the Public Service Commission had the "force of law" and thus "the character of law," the power to change those rates amounted to "the power to suspend law," which power, under § 21, was "reposed within the legislature itself." 345 So. 2d at 1357. The Justices concluded: "The power to suspend having been vested exclusively in the legislature by the Constitution, a fortiori it could not be delegated to the Governor in view of Section [42] of our Constitution." Id. (citing Montgomery v. State, 231 Ala. 1, 163 So. 365 (1935)).

Jackson Hospital argues, however, that the May 8 proclamation did not violate either the separation-of-powers doctrine set out in § 42(c) or § 21 because, in effect, the legislature itself, acting through the AEMA,

31

imposed the limitations on liability found in the proclamation. Specifically, the legislature, in § 31-9-13, declared that "laws" that are inconsistent with the governor's orders would automatically be suspended. Thus, Jackson Hospital contends, Governor Ivey neither suspended any law nor exercised legislative power contrary to the separation of powers. Hawkins, it argues, is distinguishable because, in that case, the governor was not acting in accord with legislative authorization. Here, Jackson Hospital asserts, the May 8 proclamation was issued in accord with the authority provided by the legislature under the AEMA. According to Jackson Hospital, the decision in Opinion of the Justices No. 238 is also distinguishable because, in that matter, the proposed bill gave the governor unlimited discretionary power. It points out that, in this case, the authority granted the governor by the AEMA is limited and could be used only under certain circumstances and, that in any event, Governor Ivey's actions were subsequently ratified by the legislature itself.[10]

---

[10]We further note that "advisory opinions" such as Opinion of the Justices No. 238 "are not binding on this Court." Burnett v. Chilton Cnty. Health Care Auth., 278 So. 3d 1220, 1230 (Ala. 2018).

In this case, as noted above, the placement of limitations on liability found in the May 8 proclamation was authorized by the legislature in the AEMA. Specifically, express legislation grants the governor power to make certain orders, rules, and regulations. § 31-9-6(1). This can occur only in limited circumstances -- when there is a determination that a state of emergency exists, which itself is limited in time and by the scope of the AEMA. § 31-9-8(a). The "functions, powers and duties" exercised under § 31-9-8(a)(5) must be "<u>necessary</u> to promote and secure the safety and protection of the civilian population," and the orders, rules, and regulations proclaimed under § 31-9-6(1) must be those "<u>necessary</u>" to carry out the provisions of the AEMA.[11] (Emphasis added.) Further, the legislature expressly stated that, in the event the governor must issue orders, rules, and regulations to meet the emergency, they have the full force and effect of law if they are contrary to existing law. § 31-9-13. The legislature, through the AEMA, did not grant the governor carte blanche or unlimited power, and "the doctrine of separation of powers does not prohibit the Legislature's delegating the power to execute and administer

---

[11]There is no challenge as to whether the liability limitations for health-care providers found in the May 8 proclamation were "necessary."

33

the laws, so long as the delegation carries reasonably clear standards governing the execution and administration." Folsom v. Wynn, 631 So. 2d 890, 894 (Ala. 1993). Importantly, the legislature has, by the ACIA, ratified and adopted Governor Ivey's actions. Finally, the limitations of liability found in the May 8 proclamation did not suspend a statute enacted by the legislature; instead, it modified and limited the principles of liability governing an action against a health-care provider.

Section 42(c) states that the purpose of the separation of powers between the legislative, executive, and judicial departments is to ensure "that the government of the State of Alabama may be a government of laws and not of individuals." It "condemns the usurpation of the power of one branch of government by the other," Ex parte Thicklin, 824 So. 2d 723, 732 (Ala. 2002), and has been described as a "restriction ... on the ability of" one branch of government "to invade the discretion and power vested in" another branch. State v. Greenetrack, Inc., 154 So. 3d 940, 957 (Ala. 2014).

The legislature, in the AEMA, has granted to the governor certain powers that are limited in scope, application, and time and that the legislature directed would temporarily suspend any law to the contrary.

34

In the unusual circumstances of the COVID-19 pandemic, during which, for all that appears, the legislature itself could not meet to address the emergency, see note 3, supra, Governor Ivey, after finding that a need existed, exercised the powers granted by the legislature to partially limit the liability of health-care providers not by suspending legislation, but by limiting common-law standards of liability. The governor was not invading the power of the legislature; instead, the legislature itself provided certain powers to the governor in limited circumstances, the legislature declared the effect of the exercise of those powers, the governor used those powers in accordance with the legislature's directives, and the legislature accepted, adopted, and ratified those acts. We cannot say, under the facts of this case, that Governor Ivey "usurped" or "invaded" the power of the legislature to the detriment of the rule of law; thus, no violation of the doctrine of the separation of powers occurred.

We also conclude that there was no violation of § 21 under the facts of this case. In Opinion of the Justices No. 238, the proposed bill expressly delegated power to the governor, in his discretion, to adjust utility rates, which power had been vested in the Public Service

Commission. We equated that power with the power to suspend laws and held that the delegation of such power, which is vested in the legislature by § 21, violated the separation of powers. 345 So. 2d at 1156 (holding that the prohibition on the delegation of suspension powers is grounded in the separation of powers found in what is now § 42(c)), and Mistretta v. United States, 488 U.S. 361, 371 (1989) ("The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government.").

The legislature has declared in the AEMA that certain laws are suspended under a certain contingency. § 31-9-13. Such suspension is limited in time, and such contingency is defined, regulated, and restricted by the AEMA. In this case, the contingency came into existence, that is, Governor Ivey found and declared an emergency and issued an order -- the May 8 proclamation -- to address the emergency under the strictures of the AEMA. That order conflicted with certain existing laws, but the legislature had preemptively declared, by § 31-9-13, that those contrary laws were temporarily suspended. In these circumstances, any suspension of the law that occurred as a result of the governor's order was effected by the legislature, not the governor. In other words,

36

contrary to the Chief Justice's dissent, the legislature, by its express enactments and words, suspended all law contrary to the governor's order. Governor Ivey did not exercise any suspension powers, and we see no delegation of powers in violation of the separation-of-powers doctrine.

Jackson Hospital was immune under the May 8 proclamation from Johnson's negligence claims. As a consequence, the immunity provided by the ACIA -- specifically, by §§ 6-5-792 and -794, which were enacted after Nathaniel's death and after Johnson's cause of action accrued -- does not impermissibly abrogate Johnson's negligence claims for purposes of § 13. Instead, those claims were already barred when the ACIA was enacted; thus, there was no "vested interest" in a cause of action on those claims. Kruszewski, 653 So. 2d at 937; see also Pickett, 238 Ala. at 545, 192 So. at 264. In light of the above, Jackson Hospital has demonstrated a clear legal right under §§ 6-5-792 and -794 to a summary judgment on those claims.

## D.

Jackson Hospital also challenges whether Johnson, in response to the motion for a summary judgment, provided sufficient evidence to demonstrate wanton conduct. As noted above, claims of wanton conduct

are excepted from the immunity provided under the ACIA and the May 8 proclamation.

This Court, on mandamus review, can determine whether a party, in response to a motion for a summary judgment grounded in immunity, presented substantial evidence of an exception to that immunity. Ex parte City of Muscle Shoals, 257 So. 3d 850, 855-58 (Ala. 2018) (reviewing whether the plaintiff presented substantial evidence of an exception to immunity), and Ex parte Estate of Reynolds, 946 So. 2d 450, 452 (Ala. 2006) (holding that the plaintiff failed to present substantial evidence that an exception to State-agent immunity existed; thus, a writ of mandamus was issued to direct the trial court to enter a summary judgment in favor of the defendant).

> "This Court's review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So. 2d 72, 74 (Ala. 2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So. 2d 949, 952-53 (Ala. 2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So. 2d 756, 758 (Ala. 1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce 'substantial evidence' as to the

existence of a genuine issue of material fact. <u>Bass v. SouthTrust Bank of Baldwin County</u>, 538 So. 2d 794, 797-98 (Ala. 1989); Ala. Code 1975, § 12-21-12. '[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' <u>West v. Founders Life Assur. Co. of Fla.</u>, 547 So. 2d 870, 871 (Ala. 1989)."

<u>Dow v. Alabama Democratic Party</u>, 897 So. 2d 1035, 1038-39 (Ala. 2004). Further, "'[w]hen the law imposes the higher burden of proof of clear and convincing evidence as to a particular claim or factual issue, the nonmovant must present evidence at the summary-judgment stage that would qualify as clear and convincing evidence if accepted and believed by the fact-finder.'" <u>Ledbetter v. Ledbetter</u>, 323 So. 3d 1210, 1213 (Ala. 2020) (quoting <u>Phillips v. Asplundh Tree Expert Co.</u>, 34 So. 3d 1260, 1266 (Ala. Civ. App. 2007)).

This Court has defined "wantonness" as "the conscious doing of some act or the omission of some duty while knowing of the existing conditions <u>and</u> being conscious that, from doing or omitting to do an act, injury will likely or probably result." <u>Ex parte Essary</u>, 992 So. 2d 5, 9 (Ala. 2007). See also <u>Armstrong Bus. Servs., Inc. v. AmSouth Bank</u>, 817 So. 2d 665, 679-80 (Ala. 2001). Jackson Hospital recounts the testimony discussed above of the respiratory therapists, Sharpe and King,

regarding the process that occurred when Nathaniel was to be transferred to another room. They disconnected Nathaniel from the BiPAP device, supplied him with supplemental oxygen through an oxygen mask, monitored his condition, and noted no problems with the process. As it did in its motion for a summary judgment, Jackson Hospital argues that there is no evidence of conduct rising to the level of wantonness. Reviewing the evidence de novo, as the standard of review requires, we agree. Jackson Hospital's motion for a summary judgment thus shifted the burden to Johnson to establish a genuine issue of material fact. Dow, supra.

Johnson, in her answer, contends that the testimony in her affidavit shows that the respiratory therapists did not reconnect an oxygen supply after Nathaniel was removed from the BiPAP device. She further cites to deposition testimony of Sharpe and King that, Johnson argues, indicates "that they knew that death could result when a patient who is on supplemental oxygen … had his oxygen removed and was left on room air." Answer at 20.

King testified in her deposition as follows:

"[Johnson's counsel:] [… If patients are] on a percentage [of oxygen] on the BiPAP and you're removing it and don't

40

replace it with any other type of supplemental oxygen, have you ever done that?

"[King:] Not if they had oxygen on the BiPAP.

"[Johnson's counsel:] And why not?

"[King:] Because they would need that oxygen.

"[Johnson's counsel:] And if they didn't get it, what could happen?

"[King:] Their PaO2 would drop.  They <u>could</u> get hypoxic.

"[Johnson's counsel:] And <u>could probably die</u>?

"[King:] <u>Possibly</u>."

(Emphasis added.)

Sharpe, the other respiratory therapist, testified:

"[Johnson's counsel:] … I'm just asking you generally. If someone was on a BiPAP and had it removed and was just on room air, is there a risk that their oxygen saturations would drop to a fatal level?

"[Sharpe:] You would never remove a patient from a BiPAP straight to … room air. You put them on oxygen. That's standard procedure.

"[Johnson's counsel:] But why would you not go straight to room air?

"[Sharpe:] Because that indicates they need some type of oxygen to be delivered.

41

"[Johnson's counsel:] And what would happen if you went straight to room air?

"[Sharpe:] Depends on the patient.

"[Johnson's counsel:] <u>Could</u> they die?

"[Sharpe:] Some patients could decline --

"[Johnson's counsel:] Decline into death?

"[Sharpe:] -- meaning they would need some type of oxygen to be delivered.

"[Johnson's counsel:] What would potentially happen if they don't get it?

"[Sharpe:] Usually, you're going to monitor your patient to decide, Hey, am I going to walk away from this patient without oxygen?

"[Johnson's counsel:] I know all that. I'm just asking you why you do all those things?

"[Sharpe:] Because that's protocol.

"[Johnson's counsel:] But what is the risk if you did not?

"[Sharpe:] I never experienced a risk if I did not, so I can't answer that.

"[Johnson's counsel:] What happens to a patient whose oxygen needs are not being met?

"[Sharpe:] They will go into respiratory distress.

"[Johnson's counsel:] And <u>could</u> that ultimately lead to death?

"[Sharpe:] Yes."

(Emphasis added.)

Even if the respiratory therapists removed Nathaniel's BiPAP device and did not replace it with an oxygen mask, the deposition testimony cited by Johnson does not demonstrate that Sharpe or King were <u>aware or conscious</u> that doing so would <u>likely or probably</u> result in Nathaniel's death. "Likely" is defined as "[a]pparently true or real; probable .... [s]howing a strong tendency; reasonably expected," <u>Black's Law Dictionary</u> 1113 (11th ed. 2019), and as "having a high probability of occurring or being true: very probable." <u>Merriam-Webster's Collegiate Dictionary</u> 721 (11th ed. 2020). "Probably" is defined as "insofar as seems reasonably true, factual, or to be expected: without much doubt." <u>Id.</u> at 989. On the other hand, King and Sharpe testified or confirmed only that death "could" or would "possibly" result. "Could" is the past tense of "can" and, as used in this testimony, is "used to indicate possibility." <u>Id.</u> at 178. "Possibly" means "it is possible or imaginable." <u>Id.</u> at 968. Caselaw further indicates that testimony that something "could" or would

43

"possibly" exist is insufficient to provide substantial evidence that such "probably" exists. See <u>Thompson v. Patton</u>, 6 So. 3d 1129, 1137 (Ala. 2008) (holding that evidence indicating that a health-care provider's negligence "possibly" caused an injury was not substantial evidence that the negligence "probably" caused the injury), and <u>Levesque v. Regional Med. Ctr. Bd.</u>, 612 So. 2d 445, 449 (Ala. 1993) (holding that testimony that certain acts "could" have caused an injury was insufficient, under the scintilla rule, to show that the acts "probably" caused the injuries).

Here, at best, Sharpe confirmed that removing Nathaniel from oxygen "could" ultimately lead to death. When asked if someone "could probably die" in such a situation, King answered: "possibly." That testimony does not establish consciousness, awareness, or knowledge that such an act, which they deny occurred, was "likely" to, or "probably" would, result in Nathaniel's death. It thus, if accepted by a trier of fact, is insufficient to qualify as clear and convincing evidence. <u>Ledbetter</u>, supra. Because Johnson has not met her burden of establishing a genuine issue of material fact as to whether King's and Sharpe's conduct was wanton, she has not established that exception to the immunity provided in the May 8 proclamation or the ACIA. Thus, the trial court

44

erred in failing to grant Jackson Hospital a summary judgment on her wantonness claims, and Jackson Hospital has established a clear legal right to the entry of a summary judgment in its favor.

## Conclusion

Based on the above, Jackson Hospital is immune from Johnson's claims; thus, we grant the petition and direct the trial court to enter a summary judgment in its favor on all of Johnson's claims against it.

PETITION GRANTED; WRIT ISSUED.

Wise, Sellers, Mendheim, and Mitchell, JJ., concur.

Shaw, J., concurs specially, with opinion.

Bryan and Stewart, JJ., concur in the result.

Parker, C.J., dissents, with opinion.

Cook, J., recuses himself.

SHAW, Justice (concurring specially)

I concur in the main opinion, which I authored. I write specially to note the following.

First, the Chief Justice, in his dissent, argues that this Court is granting mandamus relief on a ground not raised in the petition: whether Governor Ivey's "orders" immunized Jackson Hospital & Clinic, Inc. ("Jackson Hospital"), from suit. That is not the case. Jackson Hospital is immune under the Alabama Covid Immunity Act ("the ACIA"), § 6-5-790 et seq., Ala. Code 1975, specifically §§ 6-5-792 and -794. That is the issue addressed by the trial court, addressed in the petition, and discussed in parts <u>A.</u> and <u>B.</u> of the "Discussion" section of the main opinion, which holds that Jackson Hospital is immune under the ACIA.

As an alternate reason to deny the petition, Johnson raised an issue that the trial court <u>explicitly refused to address</u>: whether it would be unconstitutional to apply the ACIA in her case in violation of Ala. Const. 2022, Art. I, § 13. Jackson Hospital, in turn, argued that it was already immune under the proclamation issued by Governor Ivey on May 8, 2020 ("the May 8 proclamation"), when the ACIA was enacted and, thus, that there was no violation of § 13. Jackson Hospital's arguments and the

discussion in the main opinion related to the May 8 proclamation are to rebut and to show to be invalid this alternate reason to deny the petition; it is not the basis of this Court's decision to order that Jackson Hospital is entitled to a summary judgment. Mandamus petitions need not first anticipate and rebut all possible <u>invalid</u> reasons to deny the petition lest the issue be deemed waived. The Chief Justice may believe that Johnson's alternate reason to deny the petition is valid, but the main opinion holds that it is not. Thus, the main opinion is correctly applying the rule it cites: a mandamus petition may be denied for valid legal grounds that were not considered by the trial court.

The Chief Justice further states that the main opinion "dodge[s] the § 13 argument by focusing on Governor Ivey's orders." ___ So. 3d at ___. However, the fact that the May 8 proclamation provided immunity means that § 13 does not affect the application of the immunity provided by the ACIA in this case. That is the point of the discussion of the Governor's May 8 proclamation in part <u>C.</u> of the "Discussion" section of the main opinion. The Chief Justice may disagree with that discussion, but if his position is not accepted, then the main opinion cannot be deemed to be creating new exceptions or avoiding issues.

47

I further note that if the respiratory therapists who treated Nathaniel Johnson, Stephanie Sharpe and Taylor King, did not connect Nathaniel to supplemental oxygen after removing the BiPAP device, then that conduct could be found by a jury to be negligent. "'"'Negligence is usually characterized as an inattention, thoughtlessness, or heedlessness, a lack of due care .... "Simple negligence is the inadvertent omission of duty."'"'" Ex parte Essary, 992 So. 2d 5, 9 (Ala. 2007) (citations omitted). Here, however, Theresa Johnson alleges that their conduct was wanton, which is an entirely different, more "culpable" or "blameworthy" conduct. Although, for wantonness, "it is not essential that the actor should have entertained a specific design or intent to injure the plaintiff," it nevertheless is "the conscious doing of some act or the omission of some duty while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." Id. It rests, in part, on the tortfeasor's state of mind -- here, what Sharpe and King knew would happen if they acted in such manner. "'"'Wantonness is not merely a higher degree of culpability than negligence. ... Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the

48

doing or not doing of some act will likely result in injury….'"'" Id. (citations omitted). Here, the evidence cited simply does not establish that Sharpe and King had such awareness or consciousness. If a negligence action were allowed in this case, then the result would be different.

I also question whether § 13 of the Alabama Constitution applies to actions under the Wrongful Death Act, § 6-5-410, Ala. Code 1975. Section 13 states: "[T]hat every person, for an injury done him, in his lands, goods, person, or reputation, shall have a remedy by due process of law." Specifically, it is not readily apparent to me that a wrongful-death action provides a "remedy" for an "injury done" to a person.

Wrongful-death actions did not exist in the common law. Giles v. Parker, 230 Ala. 119, 121, 159 So. 826, 827 (1935). The purpose of the Wrongful Death Act was not to create a remedy, but to ensure the preservation of human life. Bishop v. Chilton Cnty., 990 So. 2d 287, 290 (Ala. 2008) ("[A] claim brought under the Alabama Wrongful Death Act, … where the damages are entirely punitive, [is] 'imposed for the preservation of human life,' Eich v. Town of Gulf Shores, 293 Ala. 95, 98, 300 So. 2d 354, 356 (1974), and not for the purpose of compensation,

49

McKowan v. Bentley, 773 So. 2d 990, 998 (Ala. 1999)."). See also Pickett v. Matthews, 238 Ala. 542, 548, 192 So. 261, 266 (1939) ("But the homicide statute is not the creation of a remedy, but of a cause of action for death by wrongful act, which did not exist at common law."), and Gentry v. Gilmore, 613 So. 2d 1241, 1245 (Ala. 1993) (Houston, J., concurring in the result) ("[T]he avowed public purpose of the wrongful death statute is to prevent homicide and to punish the culpable party and not to compensate for the loss."). Thus, "[t]he damages awarded are punitive in nature." Geohagan v. General Motors Corp., 291 Ala. 167, 171, 279 So. 2d 436, 439 (1973). The personal representative of an estate who is prosecuting such an action is not seeking compensation for himself or herself, the decedent, or the decedent's estate, but instead "acts as an agent of legislative appointment for declaring the public policy evidenced by the wrongful death acts." Geohagan, 291 Ala. at 171, 279 So. 2d at 439. See also Bradberry v. Carrier Corp., 86 So. 3d 973, 984 (Ala. 2011) ("'[T]he personal representative is authorized [under the Wrongful Death Act] to sue as an agent of legislative appointment for effecting the declared public policy of preventing homicides.'" (citations omitted)), and Ex parte Rodgers, 141 So. 3d 1038, 1042 (Ala. 2013) ("[T]he proceeds

collected as a result of a wrongful-death claim are not part of the decedent's estate.").

If a wrongful-death action is not a common-law remedy, its purpose is to punish tortfeasors who cause death, the personal representative who pursues such an action is an "agent" effectuating legislative policy, and such an action does not provide compensation, then I question whether such an action can be considered, in the words of § 13, as providing "a remedy" for a person for an "injury done him." Perhaps, in a future case, when the issue has been properly raised and briefed, this Court may be in a position to address my concern.

PARKER, Chief Justice (dissenting).

The Alabama Constitution is the supreme law of the state, even in emergencies. Art. XVIII, § 286.02, Ala. Const. 2022. It provides that only the Legislature has the power to suspend the laws, and it makes no exception for emergencies. Art. I, § 21, Ala. Const. 2022. It provides that the executive branch "may not" exercise legislative powers, and it makes no exception for emergencies. Art. III, § 42(c), Ala. Const. 2022. These bulwarks of constitutional government guarantee that we "may be a government of laws and not of individuals" -- a republic -- even in emergencies. Id. (separation-of-powers provision). Our Constitution gives the government structure, controls the laws, and supersedes the laws, so that we may be a government of laws and not of men.

By failing to uphold these constitutional guarantees in this case, we not only fail to uphold the right of the People to govern themselves, but we also pave the way for a less scrupulous Executive to abuse its emergency powers in the future. Because the opinion holds that the Governor's orders immunized Jackson Hospital & Clinic, Inc. ("Jackson Hospital"), from the plaintiff's suit -- which was a ground for mandamus relief that Jackson Hospital did not raise -- I respectfully dissent.

## I. A New Exception to Our Mandamus Rules

The main opinion holds that the claims of Theresa Johnson ("Theresa") are barred by the Governor's orders. Before addressing the merits of that argument, I maintain that we should have never addressed this issue for one simple reason: Jackson Hospital did not raise that ground for immunity in its petition for a writ of mandamus. In its petition, Jackson Hospital argued that it was entitled to mandamus relief for two reasons: (1) the general-immunity provisions of the Alabama Covid Immunity Act ("the ACIA"), § 6-5-790 et seq., Alabama Code 1975, entitle it to immunity and (2) in the alternative, the ACIA's safe-harbor provision entitles it to immunity. We ordered answers and briefs expecting to address only those issues. But now, even though Jackson Hospital never petitioned for mandamus relief on this ground, the main opinion grants mandamus relief on a third ground: the Governor's orders immunized it from suit.

We have held before that this Court will not consider an issue that a party does not raise in his petition for a writ of mandamus. Ex parte Wilcox Cnty. Bd. of Educ., 374 So. 3d 641, 649 n.9 (Ala. 2022). This is merely an extension of our rule that a party waives an issue that he does

53

not present in his opening brief. See, e.g., <u>Crews v. National Boat Owners Ass'n Marine Ins. Agency, Inc.</u>, 46 So. 3d 933, 942 (Ala. 2010) ("'When an appellant fails to argue an issue in its [initial] brief, that issue is waived.'") (citation omitted); see also <u>Kasten v. Saint-Gobain Performance Plastics Corp.</u>, 563 U.S. 1, 17 (2011) ("We do not normally consider a separate legal question not raised in the certiorari briefs."). This is even more true when a party is seeking a writ of mandamus, which is a "'drastic and extraordinary remedy'" as to which the petitioner "'carries a heavy burden.'" <u>Ex parte Alabama-West Florida Conf. of the United Methodist Church, Inc.</u>, [Ms. SC-2023-0385, Apr. 12, 2024] ___ So. 3d ___, ____, ____ (Ala. 2024) (citations omitted). Therefore, we have repeatedly held that the <u>petitioner</u> must demonstrate that he satisfies all four mandamus elements.[12] See, e.g., <u>Ex parte Hill</u>, 225 So. 3d 56, 63 (Ala. 2016); <u>Ex parte T.J.</u>, 89 So. 3d 744, 746 (Ala. 2012); <u>Toler v. Murray</u>, 886 So. 2d 76, 78 (Ala. 2004). If he fails to meet his burden, then he loses.

_____

[12]Those four elements are "'(1) a clear legal right to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (3) the lack of another adequate remedy; and (4) the properly invoked jurisdiction of the court.'" <u>Ex parte Gulf Health Hosps., Inc.</u>, 321 So. 3d 629, 622 (Ala. 2020) (citation omitted).

54

But instead of following our ordinary rule, the Court in this case excuses Jackson Hospital's failure to raise this critical issue in its petition. The main opinion reasons that this is excusable because the respondent raised the issue and that, therefore, we should consider upholding the circuit court's order on that ground. But this argument makes sense only if we conclude that Article I, § 13, of the Alabama Constitution does not bar the application of the ACIA to Theresa's claims. Instead of taking that issue head-on, the main opinion pivots to addressing the Governor's orders and deciding the case on that ground. I do not understand how the main opinion can dodge the § 13 argument by focusing on the Governor's orders. Even if we could have addressed the Governor's orders, we could get there only if we first concluded that § 13 did not let the ACIA bar Theresa's claims.

Perhaps the main opinion's argument is that we can address this issue because the respondent opened the door. While I might be amenable to recognizing this exception if it came up on <u>appeal</u>, a petitioner seeking the "drastic and extraordinary" remedy of <u>mandamus</u> relief has a heightened duty to get it right the first time. Regardless of how fervently the Governor and amici press us to reach their issue of interest, I do not

believe that we should abandon our rule of requiring a petitioner to raise all grounds for relief in the petition itself. Because Jackson Hospital did not ask us to address that issue in its petition, I do not believe that we should grant mandamus relief on that ground.

## II. Executive Power, Emergency Powers, and Suspension of Laws

Because the main opinion considers the issue whether the Governor's immunized Jackson Hospital from suit, the critical question becomes whether the Governor had the authority to immunize Jackson Hospital from suit before Theresa's cause of action accrued. Theresa advances two main arguments for why the answer is no: (1) Article II, § 42, of the Alabama Constitution forbids the Governor from exercising legislative power and (2) Article I, § 21, of the Alabama Constitution provides that only the Legislature may suspend the laws.[13] Jackson

---

[13]Before making these constitutional arguments, Theresa makes a statutory argument that the Executive exceeded its authority under the Alabama Emergency Management Act (the "AEMA"), § 31-9-1 et seq., Ala. Code 1975. Theresa argues that the AEMA does not explicitly allow the Governor to change tort law in an emergency. However, the AEMA grants the Governor the breathtakingly broad power to "perform and exercise such … functions, powers and duties as are necessary to promote and secure the safety and protection of the civilian population." § 31-9-8(a)(5), Ala. Code 1975. It further provides that all laws in conflict with the Governor's orders shall be suspended while the emergency lasts. § 31-9-13, Ala. Code 1975. The AEMA also provides that it shall be

Hospital and its amici counter vigorously that the Executive was operating within its sphere of executive authority and that the Legislature itself suspended the laws contingent on a finding of fact by the Governor.

For the reasons set forth below, I believe that Theresa is right. Both sides cite precedents that could be construed in favor of one party or the other. But the key to understanding these issues is the history that informed the making of the Alabama Constitution. As I will demonstrate below, the questions whether the Executive may suspend the laws or issue proclamations that change the law were settled decisively in 1689, when the English Bill of Rights went into effect. The English Bill of Rights forbade the king from using his proclamation power to change or suspend the laws, just as the Executive did during the COVID-19 pandemic. Not only did the United States and Alabama Constitutions incorporate that principle, but they made it even harder for the Executive to exercise that power than the English Bill of Rights did. Because the

---

"construed liberally in order to effectuate its purpose." § 31-9-23, Ala. Code 1975. Therefore, I find Theresa's statutory argument unavailing, leaving us with no choice but to address the constitutionality of the Governor's actions.

Alabama Constitution has never been amended to grant the Executive the broad powers it claims to be able to exercise here, it did not allow the Governor to issue the emergency proclamations -- or orders -- that made the difference in this case. Furthermore, although the Suspension Clause in § 21 of the Alabama Constitution at one time could have been interpreted to let the Executive make a finding of fact that suspended the laws, the words that could have permitted that interpretation were dropped from the Alabama Constitution in 1875 and have never returned. For those reasons, I do not believe that the Executive was authorized to immunize Jackson Hospital from Theresa's cause of action.

A. Historical Background

Neither the Federal Constitution nor State Constitutions can be interpreted in a vacuum; they must be interpreted in light of the historical sources that informed their meaning. See, e.g., New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1, 20-22 (2022) (discussing the role that history plays in constitutional analysis); Barnett v. Jones, 338 So. 3d 757, 766-67 (Ala. 2021) (Mitchell, J., concurring specially); see also LePage v. Center for Reprod. Med., P.C., [Ms. SC-2022-0515, Feb. 16, 2024] ____ So. 3d ___, ____ (Ala. 2024) (Parker, C.J., concurring

specially) (providing a nonexhaustive list of sources that can be used in discerning the Alabama Constitution's original meaning). Because the Executive's proclamation power and the Legislature's suspension power both come from the common law, I will begin my analysis there and then trace how it helped shape the Alabama Constitution, including §§ 21 and 42.

### 1. The Common Law

The history of the British government is fraught with competition between the king and Parliament. While Parliament was presumed to hold the kingdom's legislative power, the king often wielded prerogative powers that clashed with Parliament. Jack Buckley DiSorbo, On Executive Orders and the Royal Prerogative, 26 Tex. Rev. L. & Pol. 555, 571 (2022). Blackstone defined "prerogative power" as "that special pre-eminence, which the king hath, over and above all other persons, and out of the ordinary course of the common law, in right of his regal dignity." 1 William Blackstone, Commentaries on the Laws of England *232. Those powers reached a "'high-water' mark with the passage of the so-called Lex Regia of 1539. This statute gave the king expansive power to issue

proclamations with the force of law." DiSorbo, supra, at 571 (footnotes omitted).

Tension began to rise between the king and the other branches of government when the Stuart monarchs began using their proclamation powers to create legislation. Id. "'The King had the prerogative of issuing proclamations that announced the state of the law and how he intended to enforce it, but the early Stuart monarchs tried to go a huge step further by adding legal obligations, beyond those required by statutes, to their proclamations.'" Id. (quoting Robert J. Reinstein, The Limits of Executive Power, 59 Am. U. L. Rev. 259, 272 (2009)). When the king sought an advisory opinion from Sir Edward Coke on whether this was legal, Coke, on behalf of himself and the other common-law justices, informed him that "the King by his Proclamation, or other waies [sic], cannot change any part of the Common Law, or Statute Law, or the Customs of the Realm." 1 The Selected Writings of Sir Edward Coke 488 (Steve Sheppard ed. 2003) (1610).[14]

---

[14]Because the common-law courts refused to enforce those proclamations, the king resorted to bringing prosecutions in the Star Chamber, which became a notorious tool for suppressing dissenters under Charles I. Reinstein, supra, at 272.

Another of the king's prerogative powers was the power to suspend and dispense with the laws. DiSorbo, supra, at 573. That included the power to nullify or ignore preexisting laws passed by Parliament. Id. James II notoriously abused that power, and preventing the monarch from doing so in the future was a major objective of the Glorious Revolution. Id.

When William and Mary took the throne in 1689, the English enacted their own Bill of Rights to ensure that many of the abuses they had suffered would never occur again. The English Bill of Rights recognized 13 rights, the first 2 of which were the following:

> "1. That the pretended power of suspending laws, or execution of laws, by regal authority, without consent of parliament, is illegal.
>
> "2. That the pretended power of dispensing with laws, or the execution of laws, by regal authority, as it hath been assumed and exercised of late, is illegal."

An Act Declaring the Rights and Liberties of the Subject, and Settling the Succession of the Crown (Bill of Rights), 1689, 1 W. & M., Sess. 2, c. 2, §§ 1-2. Thus, from 1689 forward, the question whether the king had the power to suspend the laws or to change the law through

61

proclamations was permanently settled through the equivalent of England's First and Second Amendments. DiSorbo, supra, at 571, 573.[15]

By the time of Blackstone, the king's prerogative powers were well-settled. DiSorbo, supra, at 566-68. Specifically, the king had the following prerogative powers: (1) to make treaties, leagues, and alliances; (2) to make war and peace; (3) to take measures about the admission of strangers; (4) to veto legislation; (5) to command the military; (6) to raise and regulate the military; (7) to erect forts and military bases; (8) to appoint ports and havens; (9) to erect beacons, lighthouses, and seamarks; (10) to prohibit the export of arms or ammunition; (11) to prohibit subjects from leaving the realm without a license; (12) to command the return of subjects from overseas; (13) to establish courts of

---

[15]One year after Parliament passed the English Bill of Rights, John Locke published his famous Second Treatise on Government, in which his view of prerogative power went much further than what the English Bill of Rights allowed. According to Locke, the king's prerogative power gave him the authority "'to act according to discretion, for the publick [sic] good, without the prescription of the Law, and sometimes even against it.'" DiSorbo, supra, at 561 (quoting John Locke, Second Treatise on Government 84 (C.B. Macpherson ed., 1690)) (emphasis added). But the English Bill of Rights stands in direct opposition to Locke's view of prerogative power. Regardless of which view reflects better political theory, the law of the land was that the king did not have the kind of prerogative powers that Locke thought he should.

justice; (14) to prosecute all public offenses; (15) to issue proclamations that are grounded in and are issued to enforce the laws of the realm; (16) to confer dignities and honors (such as titles of nobility); (17) to erect and dispose of public offices; (18) to confer privileges upon private persons; (19) to erect corporations; (20) to establish public marts; (21) to regulate weights and measures; (22) to coin money; and (23) to be the head of the national church. See 1 Blackstone, Commentaries *230-70 (listing and discussing each of those prerogative powers).

The belief was that the king was absolute in regard to those powers and should not be inhibited by the law. DiSorbo, supra, at 567. However, he had no right to make law. Id. As to his proclamation power, the king could issue proclamations to enforce laws that already existed. Id. at 567-68 (quoting 1 Blackstone, Commentaries at *261). But in the long list of prerogative powers listed in Blackstone's Commentaries, the power to suspend the laws, whether to respond to a public-health crisis or other perceived emergency -- was never mentioned. See 1 Blackstone, Commentaries *230-70.

The historical record actually proves that the king's prerogative powers did not include the power to suspend the laws to deal with a

public-health crisis. Just 10 years before the Declaration of Independence, a severe grain shortage hit Britain, prompting the king to issue a proclamation imposing an embargo on the export of grain so that the people would not starve. Michael W. McConnell, The President Who Would Not Be King: Executive Power Under the Constitution 111 (Princeton Univ. Press 2020). The Crown claimed that it had the authority "'to take upon itself whatever the safety of the state may require, during the recess of parliament.'" Id. When Parliament reconvened, it debated the propriety of the proclamation. The king's ministry argued that the proclamation was "justified by public necessity and emergency." Id. at 112. Responding to the objection that the king's proclamation was tyrannical, the ministry replied that it was "'at most but a forty days of tyranny.'" Id. (citation omitted). The opposition responded that if such proclamations were validated, "'you cannot be sure of either liberty or law for forty minutes.'" Id. (citation omitted). In the end, Parliament sided with the opposition, enacting a statute declaring that the proclamation "'could not be justified by law.'" Id. (citation omitted). Blackstone wrote about it, stating that "the royal order was 'contrary to law.'" Id. (quoting 1 Blackstone, Commentaries *271 (St.

George Tucker, ed., Rothman Reprints 1969)). Because Blackstone wrote about it, the Founders would have been aware of it as well. Id.

### 2. The United States Constitution

#### a. The Convention of 1787

Although it would be a mistake to assume that the Alabama Constitution means whatever the United States Constitution means,[16] the drafters of the Alabama Constitution borrowed heavily from the Constitutions of the United States and of Mississippi.[17] We the People: Alabama's Defining Documents 13 (Alabama Department of Archives 2019). Those who drafted and read the Alabama Constitution would have understood its terms to be interpreted in light of the Federal Constitution if their provisions were identical. Therefore, we should examine whether the Federal Constitution altered the Executive's prerogative powers from what the common law provided. The answer to that question is yes, but

---

[16]See generally Jeffrey S. Sutton, 51 Imperfect Solutions: States and the Making of American Constitutional Law (Oxford Univ. Press 2018) (arguing that state constitutions can be different than the Federal Constitution).

[17]Alabama before statehood had been part of the Mississippi Territory. See Path to Statehood, Alabama Bicentennial Park (at the time of this decision, this information could be located at: https://www.al200park.alabama.gov/path-to-statehood).

it altered them by making the Executive's prerogative powers <u>even weaker</u> than what the king had under the common law.

Article II of the United States Constitution came from James Madison's Virginia Plan and was pushed through the Committee of the Whole by James Wilson. DiSorbo, supra, at 585 & n.118. According to Madison's notes, Wilson "did not consider the Prerogatives of the British Monarch as a proper guide in defining the Executive powers." 1 <u>Records of the Federal Convention of 1787</u> 65 (Max Farrand ed. 1911) (hereinafter "Farrand"). Wilson considered some of the king's prerogative powers as legislative in nature. <u>Id.</u> Wilson believed that the only functions that were strictly executive were "those of executing the laws, and appointing officers, not (appertaining to and) appointed by the Legislature." <u>Id.</u> at 66. Wilson's belief that the executive power was the power to execute the laws aligns well with the common understanding of "executive" at the time, which was "the body or person who carries the laws into effect, or superintends the enforcement of them." <u>Webster's American 1828 Dictionary of the English Language</u> 311 (Walking Lion Press 2010) (hereinafter "<u>Webster (1828)</u>").

The Committee of Detail agreed with Wilson's premise that some of the old prerogative powers were legislative in nature, because it divided up the king's prerogative powers between Congress and the President. DiSorbo, supra, at 585.[18] The Convention as a whole eventually agreed, and it sent the Federal Constitution to the states for ratification.

The new Federal Constitution did not grant the Executive the kind of prerogative powers that preceded the 1689 English Bill of Rights. Instead, it kept the prerogative powers that the king had at the time of Blackstone but divided them between two bodies instead of vesting them in one. The only Framer who argued that the President had all the prerogative powers of the English monarch was Alexander Hamilton; he

---

[18]Specifically, Congress received the following prerogative powers that used to be exercised by the king: declaring war; issuing letters of marque and reprisal; raising and supporting an army and navy; making rules for the armed forces; regulating the militia; calling the militia into national service; defining the law of nations; coining money; regulating weights and measures; establishing post offices and postal roads; issuing patents and copyrights; making rules for naturalization; regulating federal property; and creating and defining offices. McConnell, supra, at 68. In contrast, the President was given the following powers: commanding the army, navy, and militia; demanding opinions in writing; granting reprieves and pardons; appointments to office; making treaties; vetoing legislation; taking care to faithfully execute the laws; convening and adjourning Congress; and informing Congress and recommending measures. Id.

did not make that argument until well after the Convention in the Pacificus-Helvidius debate against James Madison, who took the opposite view. DiSorbo, supra, at 584-85, 592-93. Unfortunately for Hamilton, the Committee of Detail's division of the king's well-established prerogative powers between Congress and the President was fatal to his argument. Thus, the case that the Framers intended for the Executive to have amorphous prerogative powers cannot be sustained.[19]

### b. Ratification

When the states were voting on ratification, the Federalists and the Antifederalists debated Article II. Unsurprisingly, the Antifederalists believed that the President had been given too many prerogative powers. DiSorbo, supra, at 587. However, their concern was not that the President had too many unspecified prerogative powers but, rather, too many specified prerogative powers. Id. at 589. The Federalists countered

---

[19]The only exception could be the Executive's need to take immediate defensive action in time of war. See 2 Farrand at 318 (noting that the Convention followed James Madison and Elbridge Gerry's suggestion to change Congress's power to "make war" to "declare war" to give "the Executive the power to repel sudden attacks"). But ensuring that the Executive had the inherent power to act defensively to repel an immediate military threat is different than the power to respond immediately to a public-health crisis.

by pointing out the differences between the President and a king, especially that the President has no power of suspending laws. Id. at 587-88. Thus, neither the Federalists nor the Antifederalists appeared concerned that the new President would have unspecified prerogative powers.

It is also worth noting in passing that the Federalists and the Antifederalists debated whether the new executive branch would cause America to go the way of Rome, including how the office of dictator in the days of the republic eventually paved the way for Caesar. See generally Robert G. Natelson, A Republic, Not a Democracy? Initiative, Referendum, and the Constitution's Guarantee Clause, 80 Tex. L. Rev. 807 (2002); see also David J. Bederman, The Classical Constitution: Roman Republican Origins of the Habeas Suspension Clause, 17 S. Cal. Interdisc. L. J. 405, 434 (2008). While Rome was still a republic, if Rome was facing an approaching enemy or an insurrection, the Senate would take a vote to appoint a dictator, who would then be appointed by the consul. Carlos Rosenkrantz, Constitutional Emergencies in Argentina: The Romans (Not the Judges) Have the Solution, 89 Tex. L. Rev. 1557, 1580 (2011). However, the dictator's term would last only six months or

until the crisis was resolved, whichever was shorter, and he could not change the constitution or the laws during his term. Id.; Sanford Levinson, The Deepening Crisis of American Constitutionalism, 40 Ga. L. Rev. 889, 904 (2006). Only two dictators, Lucius Sulla and Julius Caesar, extended their dictatorships beyond the six-month limit. David Luban, On the Commander in Chief Power, 81 S. Cal. L. Rev. 477, 505 (2008). Caesar's dictatorship, of course, ended the republic. Id. The Antifederalists feared that the new Presidency would set America on the same path as Rome. See, e.g., 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 160 (Jonathan Elliot, ed., 2d ed. 1836) (speech of Patrick Henry, arguing that the American presidency was equivalent to the office of the Roman dictator). However, because the states eventually ratified the new Federal Constitution, it is safe to assume that the Federalists were able to convince the public that the executive branch's powers were sufficiently cabined to prevent that from happening.

Thus, the states eventually ratified the new Federal Constitution with the understanding that the executive branch would not be able to

operate outside the confines of the law. As Professor McConnell concludes:

> "It is often argued that the American President must -- and therefore does -- have emergency powers to act beyond the scope of his constitutionally and statutorily defined powers, and perhaps even in defiance of constitutional or statutory restrictions. The most familiar historical example is Lincoln's suspension of habeas corpus. But our Constitution makes no provision for extraconstitutional powers in time of emergency. The pros and cons of those arguments lie in the field of political theory, not constitutional interpretation. The concept of prerogative in the American constitutional context is confined to the exercise of defined discretionary powers, within the limits of law."

McConnell, supra, at 29 (footnote omitted).

### 3. The Alabama Constitution from 1819 to Today

As mentioned above, the Alabama Constitution of 1819 borrowed heavily from the United States Constitution and the Mississippi Constitution of 1817. We the People, supra, at 13. Article I, § 15, of the Alabama Constitution of 1819 provided: "No power of suspending laws shall be exercised, except by the general assembly, or its authority." This provision appears to have been modeled after the English Bill of Rights and captured the American sentiment that allowing only the legislative branch to suspend the laws is essential to restraining executive power.

71

Furthermore, the 1819 Constitution contained an even stronger separation-of-powers provision than the United States Constitution. Article II of the 1819 Constitution provided:

> "§ 1. The powers of the government of the State of Alabama shall be divided into three distinct departments; and each of them confided to a separate body of magistracy, to wit: those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.

> "§ 2. No person, or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

While separation of powers was inescapably implied in the United States Constitution, it was expressly provided in the Alabama Constitution, setting up even more of a firewall between the executive and legislative branches than in its federal predecessor. This sentiment was so strong among the drafters that Article II was accepted without debate. See We the People, supra, at 13; see also Journal of the 1819 Convention at 21.

Finally, the Alabama Constitution of 1819 created a "weak executive branch," requiring the Governor to be elected every two years, providing him only minor appointive powers, and allowing the Legislature to override his vetoes by a simple majority vote. We the People, supra, at 15. The Governor was also limited to two terms, which

was a limitation not made for members of the Legislature. Id.[20] Nothing in Article IV of the 1819 Constitution gave the Governor the extraordinary powers of suspending the laws or exercising unspecified prerogative powers in an emergency.

When Alabama seceded and adopted the Constitution of 1861, some delegates to the convention "argued for a stronger executive branch suitable to the extraordinary times." We the People, supra, at 38. Specifically, those delegates sought to lengthen the Governor's term to four years and to require a two-thirds vote to override his veto. Id. Despite the fact that the Civil War was on the horizon, both of those proposals were defeated. Id. Thus, even in the most drastic emergency that this state had ever seen, the People of Alabama refused to give the

---

[20]The weak executive branch appeared to be modeled after the Mississippi Constitution, whose "weak executive branch" was a "hallmark of Mississippi politics." John W. Winkle III, Constitution of 1817, The Mississippi Encyclopedia (at the time of this decision, this document could be located at: https://mississippiencyclopedia.org/entries/constitution-of-1817). The Mississippi Constitution appeared to model its weak executive branch after the Tennessee Constitution of 1796. See id. Thomas Jefferson called Tennessee's Constitution "'the least imperfect and most republican'" of the state constitutions that had been enacted by that time. Andrew Gold, The Antebellum Constitutions of Two Southern States Compared and Contrasted: South Carolina and Tennessee, 23 J. S. Legal Hist. 1, 11 (2015) (citation omitted).

executive branch the kinds of prerogative powers that Jackson Hospital

and the amici ask us to recognize in this case.

The Constitution of 1875 brought some changes to the Suspension

Clause and the executive branch. First, and quite importantly, the

Suspension Clause dropped the phrase "or its authority" and, instead,

provided: "That no power of suspending laws shall be exercised, except

by the general assembly." Art. I, § 22, Ala. Const. 1875. Second, it

extended the Governor's term to four years. We the People, supra, at 82.

Even then, the extension came with a tradeoff: the Constitution of 1875

required the salaries of members of the executive branch to be cut by

25%, and it mandated that the Legislature cut them further. Id. at 82.

Term limits for the Governor were finally abolished by the

Constitution of 1901, but the Governor was not eligible to run as his own

successor. Id. at 103; Art. V, § 116, Ala. Const. 1901.[21] However, the

separation-of-powers article, Article III, was amended to read as follows:

> "Section 42. The powers of the government of the State
> of Alabama shall be divided into three distinct departments,
> each of which shall be confided to a separate body of
> magistracy, to wit: Those which are legislative, to one; those

---

[21]The Constitution of 1901 was amended in 1968 to allow governors
to run for consecutive terms. Amend. No. 282, Ala. Const. 1901.

which are executive, to another; and those which are judicial, to another.

"Section 43. In the government of this state, except in the instances in this Constitution hereinafter expressly directed or permitted, the legislative department shall never exercise the executive and judicial powers, or either of them; the executive shall never exercise the legislative and judicial powers, or either of them; the judicial shall never exercise the legislative and executive powers, or either of them; <u>to the end that it may be a government of laws and not of men</u>."

(Emphasis added.)[22] Finally, the Suspension Clause underwent some cosmetic amendments to read: "That no power of suspending laws shall be exercised except by the legislature." Art. I, § 21, Ala. Const. 1901. However, it had no material alterations from Article I, § 22, of the Constitution of 1875.

---

[22]This emphasized language in the Alabama Constitution appears to be taken from John Adams. See John Adams, <u>Thoughts on Government</u> (Apr. 1776) (arguing that "the very definition of a Republic, is 'an Empire of Laws, and not of men'"). In 1780, Adams enshrined these words into the Massachusetts Constitution, which provided:

"In the government of this Commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: The executive shall never exercise the legislative and judicial powers, or either of them: The judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."

Part I, art. XXX, Mass. Const. 1780.

Thus, although the 1901 Constitution and its amendments altered how long the Governor could serve, it did not alter what he could do. If anything, Article III, § 43, of the Alabama Constitution of 1901 made the already existing firewall between executive and legislative power even stronger. The Alabama Constitution of 2022 made no material changes to the Governor's power, the Separation of Powers Clause, or the Suspension Clause, which continues to read: "That no power of suspending laws shall be exercised except by the legislature." Art. I, § 21, Ala. Const. 2022.

Thus, the Alabama Constitution created an even weaker executive branch than its federal counterpart. While the executive branch grew stronger over time, the scope of its power never increased. Instead, the post-Civil War Alabama Constitutions strengthened the separation-of-powers provision and eliminated the phrase "or its authority" from the Suspension Clause, meaning that only the Legislature itself could suspend the laws.

4. Pre-Alabama Emergency Management Act Precedents

Before the passage of the Alabama Emergency Management Act ("the AEMA"), § 31-9-1 et seq., Ala. Code 1975, this Court's limited

precedents on these issues aligned with the historical background described above. In <u>Montgomery v. State</u>, 231 Ala. 1, 163 So. 365 (1935), the Legislature passed a law giving the judiciary pardon and parole powers when it deemed that the interests of justice so required. This Court held that the law was unconstitutional because that power had been given to the Governor alone. 231 Ala. at 5, 163 So. at 370. Addressing the argument regarding whether the law was a valid exercise of the Legislature's suspension power, the Court held: "<u>It is quite certain that the Legislature cannot authorize the suspension of a law by another agency</u>, even in cases where it has the power to suspend the law." 231 Ala. at 4, 163 So. at 368-69 (emphasis added). This Court reiterated this principle in 1941, shortly before the passing of the AEMA. <u>Opinion of the Justices No. 60</u>, 241 Ala. 416, 418, 3 So. 2d 50, 52 (1941); see also <u>Opinion of the Justices No. 238</u>, 345 So. 2d 1354, 1357 (Ala. 1977).

If an emergency arose and the Governor lacked the power to deal with it, there was a simple solution: Call the Legislature into a special session. See Art. V, § 122, Ala. Const. 1901. Indeed, this Court held that if "an emergency or necessity should arise, there is no reason why the Governor cannot convene the Legislature into a special session …."

Opinion of the Justices No. 10, 222 Ala. 353, 354, 132 So. 311, 312 (1931).

The Court reaffirmed this rule shortly before the passage of the AEMA.

Opinion of the Justices No. 74, 249 Ala. 153, 154, 30 So. 2d 391, 392
(1947).

Finally, although it is only persuasive authority, it is also worth
noting that even the United States Supreme Court shared these views in
the 19th and early 20th centuries. Immediately after the Civil War,
which was the greatest crisis this country had ever seen, that Court said
the following:

> "The Constitution of the United States is a law for rulers and
> people, equally in war and in peace, and covers with the shield
> of its protection all classes of men, at all times, and under all
> circumstances. No doctrine, involving more pernicious
> consequences, was ever invented by the wit of man than that
> any of its provisions can be suspended during any of the great
> exigencies of government. Such a doctrine leads directly to
> anarchy or despotism, but the theory of necessity on which it
> is based is false; for the government, within the Constitution,
> has all the powers granted to it, which are necessary to
> preserve its existence; as has been happily proved by the
> result of the great effort to throw off its just authority."

Ex parte Milligan, 71 U.S. (4 Wall.) 2, 120-21 (1866).

This view carried on into the early 20th century as well:

> "Emergency does not create power. Emergency does not
> increase granted power or remove or diminish the restrictions
> imposed upon power granted or reserved. The Constitution

was adopted in a period of grave emergency. Its grants of power to the federal government and its limitations of the power of the States were determined in the light of emergency, and they are not altered by emergency. What power was thus granted and what limitations were thus imposed are questions which have always been, and always will be, the subject of close examination under our constitutional system."

Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 425-26 (1934).

One could argue that the United States Supreme Court's decision in Jacobson v. Massachusetts, 197 U.S. 11 (1905), cuts the other way. In Jacobson, the United States Supreme Court rejected a 14th Amendment challenge to a Massachusetts law that allowed municipalities to require citizens to get vaccinated during a smallpox outbreak. Specifically, the Court held:

"If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution."

Jacobson, 197 U.S. at 31. But as Justice Alito has observed: "Language in Jacobson must be read in context, and it is important to keep in mind

that <u>Jacobson</u> primarily involved a substantive due process challenge to a local ordinance requiring residents to be vaccinated for small pox." <u>Calvary Chapel Dayton Valley v. Sisolak</u>, 591 U.S. \_\_\_, \_\_\_, 140 S. Ct. 2603, 2608 (2020) (Alito, J., dissenting). In other words, <u>Jacobson</u> stands for the unremarkable proposition that federal courts do not have jurisdiction to strike down a state's use of its police powers based on vague and unspecified liberty interests that are not actually found in the Constitution of the United States. See <u>Dobbs v. Jackson Women's Health Org.</u>, 597 U.S. 215, 239-40 (2022). <u>Jacobson</u> does not stand for the proposition that the government can get away with whatever it wants in an emergency.

    <u>5. Conclusions</u>

Drawing on such a rich historical background, it is incredibly difficult to argue that the Alabama Constitution allows the Governor to change the law or to suspend the law, even during an emergency. Such powers had not been exercised since the Stuart monarchs, and even then they were not successful. The 1689 English Bill of Rights settled the questions whether the king could suspend the laws or change the law with a proclamation. The Americans created an even weaker executive

branch than the British had, dividing the remaining prerogative powers between the legislative and executive branches.

Finally, the People of Alabama created an even weaker executive branch than the Americans did. While Alabamians eventually allowed its Governor to serve longer than originally allowed in 1819, they also increased the strength of the separation-of-powers provision in the Alabama Constitution. Moreover, if any argument could be made that the Legislature could authorize the Executive to suspend the laws under its authority, such an argument is foreclosed by dropping the words "or its authority" from the Suspension Clause in 1875. See Ex parte Melof, 735 So. 2d 1172, 1182 (Ala. 1999) (concluding that the guarantee of equal protection in Alabama comes from the 14th Amendment alone because the 1901 Constitution dropped the 1875 Constitution's Equal Protection Clause); see also Pinigis v. Regions Bank, 977 So. 2d 446, 452 (Ala. 2007) ("It is well settled that when the legislature makes a 'material change in the language of [an] original act,' it is 'presumed to indicate a change in legal rights.'") (quoting 1A Norman J. Singer, Statutes & Statutory Construction § 22:30 (6th ed. 2002))). In light of its history, the Constitution of Alabama is incredibly clear: the Executive may not

81

suspend the law or exercise proclamation powers that override the laws of this state.

B. The World War II Era

This Court's jurisprudence finally began to shift during the World War II era, holding that the government could go against the law sometimes in extraordinary circumstances. For instance, as to the issue of vested rights, this Court held that the Legislature may interfere with vested rights if the interference was (1) "made necessary by a great public calamity," Mutual Bldg. & Loan Ass'n v. Moore, 232 Ala. 488, 492, 169 So. 1, 5 (1936), (2) temporary in duration, and (3) "limited by reasonable conditions appropriate to the emergency." First Nat'l Bank of Birmingham v. Jaffe, 239 Ala. 567, 571, 196 So. 103, 106 (1940). As the Attorney General's amicus brief notes, that shift may be explained by the fact that America had just come out of the Great Depression and was on the brink of World War II.

As to the issue of executive power specifically, Justice Jackson's famous concurrence in Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 634 (1952), became the seminal opinion regarding how to examine the Executive's actions during an emergency. See, e.g., Zivotofsky ex rel.

<u>Zivotofsky v. Kerry</u>, 576 U.S. 1, 10 (2015) (holding that the United States Supreme Court follows Justice Jackson's <u>Youngstown</u> framework). Justice Jackson claimed that "what our forefathers did envision, or would have envisioned had they foreseen modern conditions, must be divined from materials almost as enigmatic as the dreams Joseph was called upon to interpret for Pharaoh." 343 U.S. at 634. Examining the historical record from Hamilton and Madison's debates through the works of Theodore Roosevelt, Justice Jackson claimed that the sources on both sides of the historical debate "largely cancel each other." <u>Id.</u> at 635 & n.1. He then proposed his famous three-part framework that many have followed in the years since then. <u>Id.</u> at 635-38.[23] Jackson Hospital and a supporting amicus brief urge us to follow Justice Jackson's framework here.

But with all due respect to Justice Jackson, I believe that his premise that the historical evidence was inconclusive was incorrect. He

---

[23]Justice Jackson's framework can be summarized as follows: (1) When the President acts pursuant to authorization from Congress, his power is at its maximum; (2) when the President acts where Congress has not spoken either way, there is a "zone of twilight in which he and Congress may have concurrent authority"; and (3) when the President acts in a way incompatible with the will of Congress, then his power must be "exclusive" and "conclusive" as to the matter. <u>Id.</u> at 635-38.

found the text and history of the Federal Constitution too ambiguous to resolve the question, so he looked to the Federal Constitution's structure instead. I respectfully submit that the problem with his approach is that he looked no further back than 1787 to inform his research. See id. at 635 & n.1. As I have demonstrated above, the question whether the Executive can suspend the law or act in contravention of the law, even in an emergency, was so well-settled by that point that it did not even need to be debated in 1787.

C. The Passage of the AEMA

Although the People of this state never amended the Alabama Constitution to reflect the modern view of emergency executive powers discussed above in Part II.B, the Legislature passed the AEMA in 1955. From what I can tell, the threat of nuclear war with the Soviet Union spurred the passage of the AEMA. See § 31-9-2(a), Ala. Code 1975 (declaring that the AEMA was needed because of "the existing and increasing possibility of the occurrence of disasters or emergencies of unprecedented size and destructiveness resulting from enemy attack, sabotage, or other hostile action ...."). The AEMA gives either the Governor or the Legislature the power to declare that an emergency

84

exists. § 31-9-8(a), Ala. Code 1975. The state of emergency automatically terminates after 60 days, <u>but</u> the Governor has the power to extend the state of emergency <u>simply by issuing another proclamation</u>. <u>Id.</u> The Legislature is therefore powerless to check the Governor's decision to declare a state of emergency or to extend it.

The powers of the Governor during an emergency are quite expansive. First, the AEMA provides that "[a]ll existing laws, ordinances, rules, and regulations or parts thereof inconsistent with the provisions of [the AEMA] or of any order, rule, or regulation issued under the authority of [the AEMA], shall be suspended during the period of time and to the extent that such inconsistency exists." § 31-9-13, Ala. Code 1975.[24] Second, it provides that all orders promulgated by the Governor during an emergency "shall have the full force and effect of law." <u>Id.</u> Finally, the AEMA gives the Governor the authority "[t]o perform and exercise such other functions, powers and duties as are necessary to promote and secure the safety and protection of the civilian population." § 31-9-8(a)(5), Ala. Code 1975.

_____

[24]Notice that the AEMA purports to suspend all "laws, ordinances, rules, and regulations" inconsistent with the Executive's orders, but it does not try to suspend the Alabama Constitution itself.

Thus, by granting the Executive the power to decide when to declare an emergency, when to terminate the emergency, and to do whatever is "necessary" to "promote" the protection of the civilian population, while suspending duly promulgated laws that stand in its way, the AEMA gives the Executive the power to replace the rule of law with the rule of man with the stroke of a pen. There is no meaningful check on this authority, which is an integral part of our constitutional system. See The Federalist No. 51 (James Madison) 349 (Jacob Cooke, ed., Wesleyan Univ. Press 1961) ("Ambition must be made to counteract ambition."); see also Antonin Scalia, Structure Is Everything, in The Essential Scalia 36-38 (Jeffrey S. Sutton & Edward Whelan, eds., Crown Forum 2020) (arguing that constitutional guarantees are nothing more than "parchment guarantees" if they do not "prevent the centralization of power in one man or one party"). "Unconstrained power tempts usurpation." Eknes-Tucker v. Governor of Alabama, 114 F. 4th 1241, ___ (11th Cir. 2024) (Pryor, C.J., concurring).

The historical record is also squarely against the broad powers that the AEMA purports to give the Governor. The 1689 English Bill of Rights prevented the king from suspending the laws and from issuing

proclamations that are de facto legislation. Furthermore, the historical example of the grain crisis is exactly on point. Despite his good intentions, the king's proclamation suspending the export of grain, even for the compelling reasons of protecting the public health and safety, was still not within his powers. If the British Constitution did not permit " 'but a forty days of tyranny,' " then surely the Alabama Constitution does not permit even a mere 40 minutes of one-man rule. McConnell, supra, at 112 (citation omitted).

In modern times, we have held to the basic principle that the executive branch may not make law, but the legislative branch may delegate authority on how to execute it. See, e.g., <u>Monroe v. Harris</u>, 762 So. 2d 828, 831-32 (Ala. 2000). I have no objection to this general framework. But without the historical background needed to interpret this rule, nearly any Executive order -- no matter how sweeping the order may be in its scope -- could arguably be construed not as the product of the delegation of legislative authority but rather as the product of the Legislature's conferring authority on how to administer the law, which is what Jackson Hospital and its amici argue in this case. But in light of

the Alabama Constitution's text and the history, which tell us where the metes and bounds of executive power lie, I cannot buy their arguments.

The Alabama Constitution already authorizes the Executive to take immediate action in some matters but not those at issue in this case. Article V, § 131, Ala. Const. 2022, authorizes the Executive to call out the militia and volunteer forces "to execute the laws, suppress insurrection, and repel invasion." Thus, the People of this state have long been aware that the Executive might need to take swift and decisive action to confront crises of the greatest magnitude that require a military response, and they have authorized the Executive to do so. If the People of this state considered the kind of issue present in this case to be of the same magnitude, then they would have amended the Alabama Constitution to give the Executive appropriate emergency powers to respond to it, but they did not do so. "The expression of one thing implies the exclusion of the others (expression unius est exclusion alterius)." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107 (Thomson/West 2012).

Perhaps the quiet part that nobody wants to say out loud is that many people believe that the Alabama Constitution is inadequate for

88

today's exigencies.[25] I disagree. Hundreds of years of experience have shown that the law can allow the Executive to do its job without exceeding its constitutional sphere of authority. But even if it were true that the Alabama Constitution was outdated, the solution is not to break it but to amend it. As George Washington warned:

> "If, in the opinion of the People, the distribution or modification of the constitutional powers be in any particular wrong, let it be corrected by an amendment in the way which the constitution designates. But let there be no change by usurpation; for though this, in one instance, may be the instrument of good, it is the customary weapon by which free Governments are destroyed. The precedent must always greatly overbalance in permanent evil any partial or transient benefit, which the use can at any time yield."

George Washington, Farewell Address, in One Nation Under God 101-02 (Roy S. Moore et al., eds., 2014) (1796).

D. Application to Governor Proclamations

In this case, Governor proclamations purported to suspend normal medical-malpractice laws, allow hospitals to adopt alternative standards

---

[25]This has become a theme in a recent series of United States Supreme Court decisions checking the power of the administrative state. See, e.g., West Virginia v. EPA, 597 U.S. 697, 732 (2022) (Gorsuch, J., concurring) ("[T]he dissent seems to suggest that we should not be unduly "'concerned'" with the Constitution's assignment of the legislative power to Congress. … Echoing Woodrow Wilson, the dissent seems to think 'a modern Nation' cannot afford such sentiments.").

of care, and immunize health-care providers from suit. But in light of the text and history of the Alabama Constitution as explained above, I do not believe that any of this can be justified as a mere administrative act. On the contrary, when the Executive takes actions like these that override the regular laws of this state, the Executive has crossed the line from executing law into making law. Therefore, I believe that Governor proclamations -- or orders -- could not have immunized Jackson Hospital because the Executive was not authorized to do so.[26]

The Governor argues that the Legislature may make suspension of the laws contingent on the finding of a fact by the Executive. However, such an argument is foreclosed by Article I, § 21, of the Alabama Constitution. As we held in Montgomery, "the Legislature cannot

---

[26]Since the onset of the COVID-19 pandemic, we have had two cases in which a majority of the Justices have ruled against those who brought challenges to orders issued by the Governor in response to the COVID-19 pandemic. But in both of those cases, we were unable to get to the merits. Munza v. Ivey, 334 So. 3d 211, 218-19 (Ala. 2021) (holding that plaintiffs failed to show how they were injured by the Governor's mask mandate when there was no credible threat of enforcement); Turner v. Ivey, [Ms. SC-2022-0538, July 21, 2023] ___ So. 3d ___, ___ n.7 (Ala. 2023) (plurality opinion) (declining to reach the merits of a challenge to Governor orders because of the inadequacy of the briefing). Neither Munza nor Turner validated Governor use of emergency powers, and therefore these precedents do not pose a problem for concluding that the Executive exceeded its authority.

authorize the suspension of a law by another agency." 231 Ala. at 4, 163 So. at 370. The question becomes which entity is suspending the laws: the Legislature or the Executive? The plain text of the Alabama Constitution requires the Legislature to be the entity that suspends the laws. Art. I, § 21, Ala. Const. 2022. In other words, the Alabama Constitution requires the Legislature to <u>actively</u> suspend the laws, not to <u>passively</u> suspend the laws. Perhaps the Governor's argument could have been sustained if the Suspension Clause had kept the words "or its authority," which might have allowed the Legislature to delegate this power to the Executive. But because the Alabama Constitution dropped that phrase in 1875, this is no longer a viable option. The suspension power belongs to the Legislature alone; therefore, the Legislature must <u>actively</u> suspend the laws to invoke that power.

The Executive warns that limiting its power will result in the Executive being unable to respond to ordinary emergencies. But that is unlikely for two reasons. First, the AEMA is much more specific when it comes to the Governor's authority to respond to natural disasters like flooding, hurricanes, and tornadoes than § 31-9-8(a)(5)'s breathtakingly broad power to do whatever is "necessary" to promote the protection of

91

the public. See § 31-9-6, Ala. Code 1975 (authorizing the Governor to take specific actions to prepare for and respond to common disasters). Second, the text of the AEMA on that issue is sufficiently clear enough to do what has always been permissible: giving the executive branch the authority to decide how to execute the law without deciding what the law shall be. See Monroe, 762 So. 2d at 831-32. As Chief Justice Marshall wrote for the United States Supreme Court early in our republic, "important subjects … must be entirely regulated by the legislature itself," whereas, regarding subjects of "less interest, … a general provision may be made, and power given to those who are to act under such general provisions to fill up the details." Wayman v. Southard, 23 U.S. (10 Wheat.) 1, 43 (1825); see also Biden v. Nebraska, 600 U.S. ___, ___, 143 S. Ct. 2355, 2380-81 (2023) (Barrett, J., concurring) ("[I]n a system of separated powers, a reasonably informed interpreter would expect Congress to legislate on 'important subjects' while delegating away only 'the details.'"). Other parts of the AEMA allow the Governor to respond to routine disasters, but the portions of the AEMA at issue in this case are very different. See Part II.C, supra. To take such drastic and unprecedented executive action

as we saw in this case, the Legislature itself must have acted to specifically and explicitly authorize it.

If a Governor believes that my view is too strict, there is a very simple solution. When an emergency such as a pandemic hits, the Governor could call the Legislature into a special session to decide whether the laws should be suspended. Art. V, § 122, Ala. Const. 2022. The Legislature could then vote to suspend the laws that the Governor has recommended suspending. This would allow the Executive to take quick action to respond to emergencies while still maintaining a necessary check on its power by having the People's representatives vote.

### III. The Right-to-Remedy Clause

Finally, Theresa argues that because her cause of action vested before the Legislature passed the ACIA, applying the ACIA retroactively to extinguish her cause of action would violate Article I, § 13, Ala. Const. 2022. The main opinion holds that Theresa had no vested cause of action, and the special concurrence questions whether § 13 applies to wrongful-death actions. For the reasons set forth below, I agree with Theresa.

Section 13 provides: "That all courts shall be open; and that every person, for any injury done him, in his lands, goods, person, or reputation,

shall have a remedy by due process of law; and right and justice shall be administered without sale, denial, or delay."[27] Section 13's roots go back to the Magna Charta of 1215, which provided, in relevant part:

> "46. No freeman shall be taken, or imprisoned, or disseis'd, or outlaw'd, or banished or any ways destroyed; nor will we pass upon him, or commit him to prison, unles [sic] by the legal judgment of his peers, or by the law of the land.

> "47. We will sell to no man, we will deny no man, nor defer right or justice."

In his treatise on English law, Sir Edward Coke explained these provisions of the Magna Charta by saying: "[E]very subject of this realme [sic], for injury done to him in <u>honis, terries, vel persona</u>[28] … may take his remedy by the course of law, and have justice, and right for the injury done to him, freely without sale, fully without any deniall [sic], and

---

[27]The Attorney General's amicus brief provides an excellent historical discussion of § 13. Multiple Justices on this Court have invited this kind of briefing in recent years. See, e.g., <u>Young Ams. for Liberty at Univ. of Alabama in Huntsville v. St. John</u>, 376 So. 3d 460, 470-73 (Ala. 2022) (Parker, C.J., concurring in part and concurring in the result); <u>Barnett v. Jones</u>, 338 So. 3d 757, 766 (Ala. 2021) (Mitchell, J., concurring specially); see also <u>Hanes v. Merrill</u>, 384 So. 3d 616, 623 (Ala. 2023) (Cook, J., concurring specially). I appreciate the effort that the Attorney General has made to provide us with that kind of briefing, and I have found it helpful in this case.

[28]This means in "honors, lands, and persons."

speedily without delay." Edward Coke, <u>The Second Part of the Institutes of the Laws of England</u> 55 (1642). Coke's language eventually shaped many of the right-to-remedy provisions in American state constitutions. See Michael J. DeBoer, <u>The Right to Remedy by Due Course of Law -- A Historical Explanation and an Appeal for Reconsideration</u>, 6 Faulkner L. Rev. 135, 176-91 (2014).

At the time that America became a nation, the common law provided that, "[o]nce a person was injured, the right to an 'adequate remedy' immediately attached." Thomas R. Phillips, <u>The Constitutional Right to a Remedy</u>, 78 N.Y.U. L. Rev. 1309, 1322 (2003) (quoting 3 Blackstone, <u>Commentaries</u> *116). Alabama adopted a right-to-remedy provision when it became a state, and it remains in the Alabama Constitution to this day. Art. I, § 14, Ala. Const. 1819; art. I, § 13, Ala. Const. 2022. Because we have not amended it in any material way since 1819, it continues to carry the meaning that it had at the time it was originally adopted. <u>Steele v. County Comm'rs of Madison Cnty.</u>, 83 Ala. 304, 305, 3 So. 761, 762 (1888). Reading § 13 in light of its historical background, the inescapable conclusion is that, when a person is injured,

a right to an adequate remedy attaches immediately. Any attempt to deprive a plaintiff of an adequate remedy is unconstitutional.

This approach to § 13 has been called the "vested rights approach." Reed v. Brunson, 527 So. 2d 102, 114 (Ala. 1988); see also Adam J. MacLeod & Robert L. McFarland, Foundations of Law 508 (Carolina Academic Press 2017) (discussing what a "vested right" is). In this case, Theresa's right in her cause of action for wrongful death accrued before the ACIA was enacted. See Baugher v. Beaver Constr. Co., 791 So. 2d 932, 934 (Ala. 2000). Therefore, allowing the ACIA to cut off Theresa's vested right in her cause of action would be unconstitutional.

Various theories have been advanced to get around this problem. One amicus brief urges us to interpret § 13 according to the United States Supreme Court's substantive-due-process precedents and subject § 13 to rational-basis review. The Attorney General urges us to hold that "legislation promulgated in response to an urgent need, like a public calamity, can justify the Legislature's reasonable and proportional exercise of the police power to impair vested rights." Attorney General's brief at 18.

But in my view, neither argument can be maintained in light of what § 13 says and means. The first amicus brief mentioned above fails to recognize that state judges have an independent duty to interpret state constitutions instead of blindly adopting United States Supreme Court precedent. Young Ams. for Liberty at Univ. of Alabama in Huntsville v. St. John, 376 So. 3d 460, 470-72 (Ala. 2022) (Parker, C.J., concurring in part and concurring in the result). This is especially true when it comes to substantive due process, an "oxymoron" that has produced some of the United States Supreme Court's most "notoriously incorrect decisions." Dobbs, 597 U.S. at 336 (Thomas, J., concurring); see also Eknes-Tucker, 114 F. 4th at ___ (Pryor, C.J., concurring) ("The doctrine of substantive due process does violence to the text of the Constitution, enjoys no historical pedigree, and offers judges little more than shifting and unilluminating standards with which to protect unenumerated rights."). And while the Attorney General's position has some support from precedents that arose on the brink of World War II, see Part II.B., supra, the Alabama Constitution has never been amended to allow the Legislature to make such exceptions. When faced with the choice of following the Constitution or following precedent that cannot be justified

in light of the Constitution's text or history, our oath requires us to follow the Constitution. See Hanes v. Merrill, 384 So. 3d 616, 624 n.5 (Ala. 2023) (Parker, C.J., concurring in part and concurring in the result); Young Ams. for Liberty, 376 So. 3d at 471-72 (Parker, C.J., concurring in part and concurring in the result).

The special concurrence postulates that wrongful-death actions might not be protected by § 13 because the objective of our wrongful-death statute is not to compensate a victim but, rather, to deter the taking of human life. However, our precedents holding that only punitive damages are available in wrongful-death actions are premised on the belief that the value of human life cannot be measured in dollars. Alabama Power Co. v. Turner, 575 So. 2d 551, 554 (Ala. 1991). Moreover, there are two goals in a wrongful-death action: deterrence and punishment. Springhill Hosps., Inc. v. West, 388 So. 3d 648, 672 (Ala. 2023). While deterrence cannot provide a remedy for a victim, punishment can. Punishment cannot bring the victim back, but it can vindicate the value of the victim's life by making the wrongdoer pay for his conduct. I believe this is how the word "remedy" would have been interpreted in 1819 when Alabama adopted its original right-to-remedy

provision. See <u>Webster (1828)</u> at 681 (defining "remedy" as "[t]hat which counteracts an evil of any kind .... Civil government is the <u>remedy</u> for the evils of natural liberty."). Therefore, I am unpersuaded that the remedy of punitive damages renders wrongful-death actions unprotected by § 13.

## IV. Conclusion

From the days of the common law until the World War II era, it was universally understood that the Executive did not have emergency powers to change, suspend, or break the law. This was so important that the English Bill of Rights addressed this issue before all other issues, and neither the United States Constitution nor the Alabama Constitution changed that framework. Yet in 2020, nearly nobody questioned whether the Executive had emergency powers; it was just questioned whether the Executive had gone too far with them. Perhaps this is because nearly nobody who lived through the COVID-19 pandemic had grown up in an era when it was not commonly assumed that the Executive sometimes had to take drastic emergency actions for which the law could not account. But in light of the historical analysis above, it is clear that the People of Alabama never gave the Executive

the kind of authority that the Executive purported to exercise in this case.

I have no doubt that Alabama's Governor, like many American governors, acted quickly during the COVID-19 pandemic in a good-faith effort to save lives. The Executive also eventually declared the emergency over on its own accord. However, the issue is whether the AEMA authorized the Executive to immunize Jackson Hospital from Theresa's cause of action. For the reasons stated above, I believe that the answer is no.

Perhaps recognizing the danger that could arise if the courts grant too much deference to the Executive during an emergency, the main opinion attempts to limit its holding to the circumstances of this case. However, as the example of the British grain shortage shows, allowing the Constitution to be broken, even slightly to meet a pressing need, is unacceptable. Doing so sets a precedent that could have disastrous consequences later.[29] While I am grateful that the main opinion's

---

[29]Even the ancients warned that usurpation often gains ground through creeping instead of lurching. "All of this has become a thing of habit …. Custom has made us callous," Cicero warned as the Roman Republic was about to collapse into a permanent dictatorship. Marcus Tullius Cicero, <u>Second Philippic Oration Against Marcus Antonius</u> in

holding is limited to the particular circumstances of this case, my fear is that this precedent will allow the line to be crossed a little further in the next case, and then a little further in the next case, and so on and so forth -- until the line is gone completely. "Liberty once lost is lost forever. When the People once surrender their share in the Legislature, and their Right of defending the Limitations upon the Government, and of resisting every Encroachment upon them, they can never regain it." Letter of John Adams to Abigail Adams, July 7, 1775.

Perhaps the Court will eventually reconsider this case or will find ways to distinguish it when similar matters arise in the future. In the meantime, my hope is that the People will realize how much power the Executive has claimed and will take appropriate steps to get the Legislature to restrain it while they have the chance. See Joseph Postell, Emergency Powers and State Legislative Capacity During the COVID-19 Pandemic, 15 N.Y.U. J. L. & Liberty 628, 652-57 (2022) (proposing

---

Cicero Orations: Philippics 1-6 161 (Loeb Classical Library 2009) (44 B.C.). The people of Rome failed to be vigilant against the gradual usurpation of their liberties until they were completely gone. We should not make the same mistake.

various legislative amendments to state emergency acts after the COVID-19 pandemic ended).

Because the People of Alabama have never amended the Alabama Constitution to give the executive branch the kind of power that our history so clearly confirms belongs to the legislative branch alone, I respectfully dissent.